THE UNITED STATES STEEL CORPORATION et al., defendants and appellants,

*v.*

J. ASPINWALL HODGE et al., complainants and respondents.

[Filed February 18th, 1903.]

1. At a meeting of the stockholders of a corporation, owners of shares are under no disability to vote because they are also directors of the corporation.  They do not vote in their fiduciary capacity, but like other stockholders, in the right of the shares held by them.

2. At a duly-convened meeting of stockholders they may lawfully enter into or authorize a contract between the company and a third party, in which directors are personally interested, if it is done by them with notice of such interest.

3. The general doctrine is well established in this state that facts known, which are sufficient to put a party upon inquiry, are sufficient to charge him with all such knowledge as he would have acquired by a proper inquiry in the ordinary course of business.

4. The rule that directors cannot lawfully enter into a contract, in the benefit of which even one of their number participates without the knowledge and consent of the stockholders, is the settled law of this state.

5. Such a contract is voidable at the option of the corporation, but is not void *per se.*  When the facts are disclosed to the stockholders it may be subsequently ratified by them.

6. When the by-laws of a corporation, adopted by the stockholders in pursuance of authority given by the act of incorporation, provide that a majority vote at a stockholders' meeting shall be binding on the corporation, every shareholder will be bound by all acts and proceedings within the scope of the power and authority conferred by the charter, which shall be approved or sanctioned by the vote of a majority of such shareholders duly taken and ascertained according to law.

7. The act of incorporation of the United States Steel Corporation requires the corporation to pay to the preferred shareholders a yearly dividend at the rate of seven per cent. per annum, in quarterly payments. By the terms of the act of 1902 said corporation cannot take advantage of its provisions, unless it shall have continuously declared and paid dividends at the rate of seven per cent. on the preferred stock, for the period of at least one year next preceding a meeting called to avail itself of the act. The meeting was held May 19th, 1902; a dividend of one and three-quarters per cent. was declared and paid for the quarter ending July 1st, 1901; a like dividend for each of the quarters ending October 1st, 1901; January 1st, 1902, and April 1st, 1902.—*Held*, that this was a compliance with the act of 1902.

On appeal from an order of the court of chancery advised by Vice-Chancellor Emery, whose opinion is reported in *19 Dick. Ch. Rep. 90.*

*Mr. Robert H. McCarter, Mr. Aben I. Elkus* (of New York), *Mr. Joseph M. Proskauer* (of New York), *Mr. Alan H. Strong, Mr. Frank Bergen* and *Mr. Edward B. Whitney* (of New York), for the complainants and respondents.

*Mr. Charles L. Corbin, Mr. Richard V. Lindabury, Mr. Francis Lynde Stetson* (of New York), *Mr. William D. Guthrie* (of New York), for the defendants and appellants.

The opinion of the court was delivered by

VAN SYCKEL, J.

The subject-matter of this appeal is an order granted by the court of chancery, at the instance of the complainants, restraining the defendants from executing, issuing, delivering or receiving any bond or mortgage, under certain resolutions of the stockholders of the United States Steel Corporation, passed May 19th, 1902, providing for the reduction of $200,000,000 of its

preferred stock and the retirement thereof out of bonds or the proceeds of bonds.

Three of the complainants in the bill as originally filed voluntarily withdrew from the suit.

The remaining complainants are Hodge, Smith and Curtis.

Hodge owns one hundred shares, acquired by him before the contract in question was made.

Smith owns two hundred shares, acquired since that time from a holder who assented to the contract.

Curtis, so far as appears, owns no stock.

The vice-chancellor properly held that the case must be considered as based wholly upon the rights of Hodge as a shareholder.

The steel corporation was organized under the General Corporation act of this state (Revision of 1896) on the 25th day of February, 1901, and the certificate of incorporation was filed on that day.

On the 1st day of April, 1901, an amended certificate of incorporation was filed, which provided, among other things, for an authorized capital of $1,100,000,000, of which $550,000,000 was to be preferred stock, divided into five million five hundred thousand shares of the par value of $100 each, and a like number of shares of common stock, of the par value of $100 each.

As required by section 18 of the General Corporation act, the amended certificate of incorporation stated that

"The holders of the preferred stock shall be entitled to receive when and as declared from the surplus or net profits of the corporation, yearly dividends, at the rate of seven per centum per annum, and no more, payable quarterly on dates to be fixed by the by-laws."

The by-laws of the company provide as follows:

"Article V.

"Sec. 5. The dates for the declaration of dividends upon the preferred, and upon the common stock of the company, shall be the days by these by-laws fixed for the regular monthly meetings of the board of directors in the months of April, July, October and January in each year, on which days the board of directors shall declare what, if any, dividends shall be declared upon the preferred stock and the common stock or either of such stocks. The dividends on the preferred stock shall be payable quarterly on the sixth Wednesday next after the several dates of the declaration thereof."

The board of directors of said corporation, having resolved that it would be advisable to decrease the capital stock of the corporation to the extent of two million shares, and to retire them by means of an issue of bonds, called a meeting of the stockholders to be held on the 19th of May, 1902, in pursuance of, and as required by, section 27 of the General Corporation law and by the act of 1902, for the purpose of voting upon the. proposed plan for the purchase and retirement of that amount of preferred stock and the issue of five per cent. bonds.

Prior to the notice of this meeting the directors had entered into a tentative contract with Messrs. J. P. Morgan & Company, bankers, under date of April 1st, 1902, by which said bankers agreed with the steel corporation that $100,000,000 face value of the new bonds would be taken and paid for, of which $80,000,000 would be paid for by a like amount of preferred stock taken at par, and $20,000,000 would be paid in cash.

To guarantee the performance of this contract a syndicate was formed by J. P. Morgan & Company, the members of which actually deposited with that firm $80,000,000 of preferred stock to be used in performance of the contract.

The effect and purport of this agreement is that the bankers agreed to buy from the steel corporation at least $100,000,000 of five per cent. bonds, and to pay therefor $20,000,000 in cash and $80,000,000 in preferred stock, at par, with an option to purchase the remaining bonds if the stockholders did not do so; and in consideration of this undertaking the bankers were to receive a commission of four per cent. on $100,000,000, and, contingently, a commission of four per cent. on any additional amount that might be taken at par by the stockholders or the bankers.

This contract with the bankers was to be subject to the approval of the stockholders.

At the stockholders' meeting on the 19th of May, 1902, duly convened, the resolution to retire the preferred stock and the resolution to adopt the bankers' contract were separate and distinct, and were voted upon and passed as separate and distinct resolutions.

The shareholders could have adopted the first and rejected the latter.

There was in attendance at the meeting, in person or by proxy, over seventy-three per cent. of the outstanding preferred stock, and over seventy-eight per cent. of the outstanding common stock. More than ninety-nine and eighty-three hundredths per cent. of the stockholders at such meeting, present either in person or by proxy, voted in favor of both resolutions, and only seventeen hundredths of one per cent. voted against them.

The by-laws of the corporation contained the following provision:

"The board of directors, in its discretion, may submit any contract or act for approval or ratification at any annual meeting of the stockholders, or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any act or contract that shall be approved or ratified by the vote of the holders of a majority of the capital stock of the company which is represented in person or by proxy at such meeting (provided, that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and as binding upon the corporation and upon all the stockholders, as though it had been approved or ratified by every stockholder of the corporation."

This by-law cannot amplify the powers of the corporation or operate to validate any act *ultra vires* the corporation, but it enabled the stockholders, by a majority vote, to ratify any contract which the entire body of stockholders or the corporation might lawfully make.

Both resolutions, therefore, received more than the vote required by the twenty-seventh section of the Corporation act and by the by-law of the company.

If all the shareholders had intended to convert their preferred shares into five per cent. bonds, they would, of course, have voted for the conversion resolution and have rejected the bankers' contract. In a scheme involving such an enormous amount of capital and affecting thousands of shareholders, it could not reasonably have been supposed that all would prefer to accept the five per cent. bonds, and it was therefore the exercise of a prudent foresight that prompted them, in order to assure the successful execution of the plan, to secure the co-operation of bankers who could command millions of capital.

When the subject-matter of this litigation was before this court at the June Term, 1902, in the case of *Berger* v. *United· States Steel Corporation,* it was expressly declared—

(1) That the act concerning corporations, as revised in 1896, authorizes corporations formed under it to retire shares of its preferred stock, purchased with bonds or the proceeds of bonds issued for that purpose, the provisions of sections 27 and 29 being complied with.

(2) The manner in which a duly-authorized plan is to be carried through is part of the business of the corporation, and, in the absence of fraud or bad faith, is not the subject of judicial control to any greater extent than other business of the corporation. The court cannot substitute its judgment for that of the directors and majority stockholders and say that a less expensive plan could be successfully adopted.

These questions, therefore, are not open to controversy in this case, in so far as the cost or wisdom of the plan is concerned.

There is an entire absence in the case of anything to show a taint of fraud or an attempt to conceal from the shareholders any fact which should have influenced their action.

That the entire proceeding was conducted with good faith, without concealment and with fairness to both parties is evinced by the fact that during all the litigation which has ensued, under the promotion of a shareowner who did not attend the meeting, not one of the vast number of shareholders who were present in person or by proxy, comprising men of great business capacity, interested to the extent of millions of dollars in the conversion plan, has questioned its propriety or expressed a desire, so far as appears, to recede from it.

The contract with the bankers was submitted to the stockholders without comment, and, as stated in the resolutions, of which a copy was tendered to the stockholders, "was not finally to become or to be operative until after approval thereof by the stockholders in special meeting assembled."

The· first reason to be considered, upon which the complainants rely to maintain their injunction, is that the action of the directors in passing the resolutions for the plan of conversion and approving the bankers' contract, was fraudulent and void,

because fifteen or more of the twenty-four members of the board of directors were interested in the syndicate which was formed to assist in carrying out the bankers' contract and to share its profits, and that the plan was never properly and legally ratified by the two-thirds vote of the stockholders required by the Corporation act, inasmuch as the votes upon the stock held or controlled by the bankers' firm and members of the syndicate must be counted to make up the necessary two-thirds, and without these votes the requisite number did not approve the reduction of stock.

The insistment that the votes of members of the syndicate, who were also directors of the company, cannot be lawfully counted in order to constitute a two-thirds vote in favor of the resolution to reduce the amount of preferred stock, is without any foundation in reason or in law.

They voted upon that resolution not as directors, not in their fiduciary capacity, but solely in the right of the shares of stock held by them. A most valuable privilege, which attaches to the ownership of stock in a corporation, is the right to vote upon it at any meeting of stockholders. As to that resolution, considered by itself, as stockholders, they owed no greater duty to their co-stockholders than those stockholders owed to them.

Like other stockholders, they had a right to be influenced by what they conceived to be for their own interest, and they cannot lawfully be denied that right; nor can it be limited or circumscribed by the fact that they occupied the position of directors in the company.

With respect to the bankers' contract a very different rule applies.

The rule that directors cannot lawfully enter into a contract, in the benefit of which even one of their number participates without the knowledge and consent of the stockholders, is so firmly entrenched in our jurisprudence that it is not open to debate.

It is emphasized and enforced in the following, among many other cases: *Staats* v. *Bergen, 2 C. E. Gr. 554; Winans* v. *Crane, 7 Vr. 394; Stroud* v. *Consumers Water Co., 27 Vr. 422; Gardner* v. *Butler, 3 Stew. Eq. 702; Guild* v. *Parker, 14 Vr.*

*430; Stewart* v. *Lehigh Valley Railroad Co.,* 9 *Vr.* 505; *Traction Co.* v. *Board of Works,* 27 *Vr.* 431.

The rule is imbedded in our jurisprudence, and it cannot be too strongly stated or too rigorously applied. But in the cases cited the contract was made by the trustee without the knowledge or consent of the *cestui que trust* and without subsequent ratification or adoption by which the vice in it could be cured.

The object of the rule is to prevent directors from secretly using their fiduciary position for their own emolument, and not to impair the right of stockholders to enter into any lawful engagement with a full disclosure of the facts.

In *Stewart* v. *Lehigh Valley Railroad Co., supra,* Mr. Justice Dixon, in delivering the opinion of this court, says: "After an examination of all the cases cited, as also such others as I have found, and a careful consideration of the principle, and the results of regarding and disregarding it, I have come to the conviction that the true legal rule is that such a contract is not void, but voidable, to be avoided at the option of the *cestui que trust,* exercised within a reasonable time; I can see no further safe modification or relaxation of the principle than this."

It is a settled rule of corporation law that the personal interest of directors renders a transaction voidable at the option of the stockholders, and not void *per se.*

Under the declaration of this court in the case last cited the shareholders may, within a reasonable time after the disclosure to them of the interest of a director, elect to avoid the contract; but if an unreasonable time is allowed to elapse without exercising such option, during which the position of directors become so changed that it would be inequitable to vacate the engagement, equity would refuse to interpose.

*A fortiori,* when the contract is entered into by the stockholders with the directors, or when the stockholders expressly authorize the directors to enter into a contract, when the stockholders have notice of the directors' interest, the agreement will be unassailable in the absence of actual fraud or want of power in the corporation.

In this case not only the bankers' contract made with J. P. Morgan & Company and approved by a two-thirds vote of the

United States Steel Corporation *v.* Hodge.

shareholders, with knowledge that J. P. Morgan was one of the directors of the steel corporation, a fact which they may be presumed to have known, but also in the circular letter accompanying the call of the stockholders' meeting to be held on the 19th of May, it was expressly stated as follows:

"To further the success of the plan there has been formed a syndicate, including some directors, which will receive four-fifths of the four per cent. compensation to be paid under the contract with Messrs. J. P. Morgan & Company, mentioned in the notice of stockholders' meeting."

The deliverance of this court with respect to the sufficiency of notice in *Gale* v. *Morris, 3 Stew. Eq. 285,* is as follows: "If the party notified make reasonable investigation, he obtains actual knowledge of these facts; if he chose not to make it, he is charged constructively with knowledge of them. The rule merely prohibits him from taking advantage of his own imprudence to the detriment of another. But as to the matters that lie within the notice the principle assumes another form. It charges the party with knowledge of those matters so far as reasonable inquiry has not dissipated their credibility. If he is unwilling to act upon the facts as the notice presents them, then the law demands that he shall make proper examination, and upon the result of that examination he may safely stand. *Williamson* v. *Brown, 15 N. Y. 354.* But if he prefer not to examine, it must be because he is satisfied to act as if the matters disclosed in the notice were true, and he cannot afterwards complain if his rights are made to rest upon them so far as they are true. The information given by the notice is equivalent to that obtained by inquiry."

In *Hazlett* v. *Stephany, 10 Dick. Ch. Rep. 68,* Vice-Chancellor Pitney said: "For these reasons I think that the facts above stated, which were clearly within defendant's knowledge, were sufficient to put him upon inquiry. The general doctrine that facts which are sufficient to put a party upon inquiry are sufficient to charge him with all such knowledge as he would have acquired by a proper inquiry, in the ordinary course of business, is, as I take it, thoroughly established in this state. It was so held in the court of appeals in the case just cited (*6 C. E. Gr.*

*463*), and that case followed *Hoy* v. *Bramhall, 4 C. E. Gr. 563*, in the same court. The doctrine of these cases has always been followed in New Jersey."

The cases in England are to the like effect. *Phosphate of Lime Co.* v. *Green, 7 C. P. 43; May* v. *Chapman, 16 Mees. & W. 355.*

The stockholders of the company are therefore chargeable with express notice that some directors were interested in the bankers' contract, and by reasonable inquiry at the meeting of May 19th they could have ascertained the names and number of such directors.

They signified by their votes that they approved the contract with such full knowledge.

In *Durfee* v. *Old Colony Railroad Co., 5 Allen 230,* Chief-Justice Bigelow says: "It may be stated as an indisputable proposition, that every person who becomes a member of a corporation aggregate by purchasing and holding shares agrees by necessary implication that he will be bound by all acts and proceedings within the scope of the powers and authority conferred by the charter, which shall be adopted or sanctioned by the vote of the majority of the shareholders of the corporation, duly taken and ascertained according to law. This is the unavoidable result of the fundamental principle that the majority of the stockholders can regulate and control the lawful exercise of the powers conferred on a corporation by its charter."

In the case of the steel corporation the right of the majority does not rest upon implication. In the by-laws adopted by the stockholders, in pursuance of authority given by the act of incorporation, such power is expressly given to the majority.

In *Leavenworth* v. *Chicago Railway Co., 134 U. S. 688,* it was held that the action of the stockholders validated the contract where nine out of thirteen directors were personally interested.

In the cases of *Nye* v. *Storer, 168 Mass. 53,* and *Bjorngaard* v. *Goodhue County Bank, 49 Minn. 483,* a like infirmity in contracts was held to be eliminated by the vote of a majority of stockholders.

The like view is expressed by the court of appeals of Maryland in *Shaw* v. *Davis, 78 Md. 308,* as follows: "It may be stated as the result of all the authorities, that whenever any action of

either directors or stockholders is relied on in a suit by a minority stockholder for the purpose of invoking the interposition of a court of equity, if the act complained of be neither *ultra vires,* fraudulent or illegal, the court will refuse its intervention because powerless to grant it, and will leave all such matters to be disposed of by the majority of the stockholders in such manner as their interest may dictate, and their action will be binding on all, whether approved of by the minority or not."

The healing effect of the ratification by stockholders upon a voidable contract entered into by directors is fully recognized in *Grant* v. *United Kingdom Railway Co., 40 Ch. Div. 135.*

In the case *sub judice,* the contract was in effect made between the stockholders themselves and J. P. Morgan & Company, and it cannot be successfully assailed without maintaining that stockholders are without capacity to make a valid contract with the directors of their company.

It would be manifestly contrary to fair dealing and good faith to permit stockholders to invite directors to enter into an engagement, and after the directors had put themselves in a position in which the contract could be enforced against them, to permit the stockholders to deprive them of the benefits of it.

In my investigation no case has been found which will justify such a result.

In the proper application of a legal rule, it cannot be necessary in order to do justice to one party to do manifest injustice to the other. Such inequity would condemn the application of the rule, not the rule itself.

On the ground which has been discussed, upon the facts presented, the complainant's case is without support in law. He made no inquiry, did not attend the meeting, and now attempts to deprive the two-thirds of the stockholders who did attend the May meeting of the benefit of a contract which they then approved, and which, as has been held in the *Berger Case,* the corporation had power to make.

As was declared in that case (citing *Ellerman* v. *Chicago Junction Co., 4 Dick. Ch. Rep. 217*), individual stockholders cannot question, in judicial proceedings, corporate acts of directors, if the same are within the powers of the corporation and

in furtherance of its purposes; are not unlawful or against good morals, are done in good faith and in the exercise of an honest judgment.

Much less can a shareholder challenge like action taken by a majority of his co-stockholders.

The remaining grounds upon which the complainant rests his claim to relief relate to the act of 1902.

That act, as this court adjudged in the *Berger Case,* is a restraining act, and required a due observance of its provisions by the steel company as a condition precedent to the right to enter into the conversion scheme.

The first alleged infirmity relied upon by the complainant is that dividends were not made in conformity with the requirement of the act of 1902, which is a supplement to the General Corporation act.

The language of the act with respect to this condition is:

"Every corporation organized under this act * * * that shall have issued preferred stock entitling the holders thereof to receive dividends at a rate exceeding five per centum per annum, and that shall have continuously declared and paid dividends at such rate, on such preferred stock, for the period of at least one year next preceding the meeting."

The amended certificate of incorporation of the company provided that

"the holders of the preferred stock shall be entitled to receive, when and as declared, yearly dividends at the rate of seven per cent. per annum, payable quarterly on dates to be fixed by the by-laws."

It is admitted that a dividend of one and three-quarters per cent. was declared by the company for the three months beginning on the 1st of April, 1901, and ending on the 1st of July, 1901; that a like dividend was declared for the three months beginning July 1st, 1901, and ending October 1st, 1901; that a like dividend was declared for the three months beginning October 1st, 1901, and ending January 1st, 1902, and that a like dividend was declared for the three months beginning January 1st, 1902, and ending April 1st, 1902, all of which dividends were paid by the company to the stockholders within the time fixed by the by-laws and before the meeting of May 19th, 1902.

United States Steel Corporation *v.* Hodge.

This provision in the act of 1902 was drafted in contemplation of the eighteenth section of the Corporation act of 1896, giving power to create preferred stock and prescribing that

"the holders thereof shall be entitled to receive and the corporation shall be bound to pay thereon a fixed yearly dividend, to be expressed in the certificate, not exceeding eight per centum, payable quarterly, half yearly or yearly, before any dividends shall be set apart or paid on the common stock, and such dividends may be made cumulative."

The dividends on the preferred stock were, by the amended certificate of incorporation of the steel company and the by-laws, made payable quarterly, were cumulative and to be paid before any dividend was paid on the common stock.

A dividend on the preferred stock might have been passed, and it was therefore intended by the act of 1902 to require, in compliance with section 18, that before its provisions could be taken advantage of the company must have paid a dividend at the rate of seven per cent. for the full year next preceding the meeting to retire the preferred stock, and it was a compliance with that section, whether the dividend was paid quarterly, half-yearly or at the end of the year. The dividend required by the eighteenth section is a yearly dividend of seven per cent., and it was paid in four quarterly payments.

The vice-chancellor held, in construing this legislation, that if the dividend had been paid annually there must have been two dividends of seven per cent. each, covering two previous years, to make the payment continuous; that if the dividends were paid half-yearly there must have been three payments of three and a half per cent. each, covering eighteen months, in order to make the payment continuous; that if paid quarterly, as in this case, there must have been five payments of one and three-quarters per cent. each, covering fifteen months, to satisfy the statute, and so, if the dividends had been paid monthly, there must have been thirteen dividends, covering a period of thirteen months.

The mere statement of this view is destructive of it.

Thus interpreted the law would provide no fixed, determinate, uniform time during which dividends must be paid, but would

leave it optional with the corporation to get the benefit of the law by making dividends so payable that a period either of two years or only thirteen months need be covered. As to a corporation making dividends payable annually one rule would prevail, while to a corporation paying quarterly a different rule would apply.

The very essence of a law is that it is uniform and universal within the territory to which it relates; it must apply in the same way to every one; it cannot be varied at the will of the corporation.

The construction adopted in the court below is clearly erroneous, and gives a meaning to the word "continuous" which is wholly unwarranted.

It of course must not be given its strictest meaning, which would require a never-ceasing payment of dividends, like the continuous flow of water.

Applied to dividends it means "during one year," which is equivalent to the words of the act, "for the period of at least one year."

The act does not prescribe that seven per cent. dividends shall have been continuously declared and paid for the period of at least one year next preceding the meeting, but that dividends at the rate of seven per cent. shall be paid.

The force of the word "continuously" evidently is that dividends at the rate of seven per cent. must be paid for a continuous period of one year, so that where dividends are paid quarterly, a quarterly dividend cannot be passed without losing the benefit of the act.

The payment of dividends is to be for the period of one year, the dividends are to be paid out of surplus over and above the amount of the capital stock and outstanding indebtedness, and are to be made for the "period." When a dividend is made, it is made as a dividend for the period of three months then previously elapsed; a dividend for a future period has not been known in the business history of corporations.

When a dividend is paid, it is paid for the period then elapsed.

In this case a dividend at the rate of seven per cent. was paid for the first quarter, and a like dividend for the second, third

United States Steel Corporation *v.* Hodge.

and fourth quarters of the year next preceding the meeting of the stockholders.

If that was not a payment continuously at the rate of seven per cent. for one year next preceding the meeting, for what year was it a continuous payment?

The meaning of the draftsman of this provision may be further elucidated by dropping out of it the words, "for the period of at least one year next preceding the meeting."

The act will then read: "A corporation that shall have continuously declared and paid dividends at the rate of seven per cent. on such preferred stock."

This language is ambiguous; it might be construed to mean a corporation that had paid three consecutive dividends at the rate of seven per cent.; that would be a continuous payment.

It might also be held to mean a corporation that had continuously declared and paid dividends during the entire period of its corporate existence.

To exclude this uncertainty the words were added, "for the period of at least one year next preceding the meeting."

The dividend was required to extend over the entire preceding year, and the failure to pay the dividend for any one of the quarters would break the continuity and require the company thereafter to make four consecutive quarterly dividends of one and three-quarters per cent. each to make the act of 1902 available.

The cases as to publications in newspapers, cited and relied on by the vice-chancellor as his only authority, are not in point.

Our laws require publication of notice of sale "at least four weeks successively, once a week, next preceding the time of sale." It has been uniformly and properly held to require a publication for four full weeks, once a week, and that the publication must begin four weeks next before the day of sale, and that four full weeks must elapse between the first publication and the day of sale. The statute requires that there shall be four weeks' notice of sale, and if sale can be made after four weekly publications, it might be made after the expiration of only twenty-two days.

A publication has no relation to a previously elapsed period; it is a publication only on the very day it is made, while a divi-

United States Steel Corporation v. Hodge.

dend relates to and is for a time previously run. All that the act of 1902 requires with respect to payment of dividends is that the provision of section 18 of the General Corporation law shall be complied with.

The other objections urged as to the want of conformity by the defendant corporation with the requirements of the act of 1902 have been duly considered and are deemed to be without merit.

There is no ground presented by the case, or agitated in the briefs of counsel, which will justify the interposition of a court of equity to arrest the proposed action of the defendants.

The decree below should be reversed and the injunction dissolved, with costs in this court and in the court below.

*For reversal*—THE CHIEF-JUSTICE, VAN SYCKEL, GARRISON, FORT, GARRETSON, HENDRICKSON, PITNEY, BOGERT, VOORHEES, VROOM—10.

*For affirmance*—None.