Application for preliminary injunction heard on bills and affidavits, defendant's affidavits and examination of officers of the defendant company by complainants' counsel.
The bill was filed on behalf of the complainant, General Investment Company, and all other seven per cent. preferred stockholders of the defendant company. After an order to show cause had been allowed, the restraint therein was modified so as to permit the stockholders' meeting to proceed to that point where a vote could be taken and all other proceedings preliminary to the filing of a certified copy of the amendments in the office of the secretary of state. There appeared to be facts in this bill distinguishing the situation from those in Grausman v.Porto Rican-American Tobacco Co., 95 N.J. Eq. 223. But after the stockholders' meeting had been held, there was filed another bill containing practically the same facts, and seeking the same relief on behalf of five other stockholders. The two suits have subsequently been consolidated and heard together.
The defendant is a corporation organized in 1899 under our General Corporation act of 1896. It is engaged in the business of manufacturing leather, leather products and similar commodities. Its total authorized capital stock is fixed at $35,000,000, divided into three hundred and fifty thousand shares, one-half thereof being preferred, with cumulative seven per cent. dividends, and the remaining half common. There are now one hundred and twenty-five thousand four hundred and eighty-three shares of preferred stock worth $12,548,300 at par, issued and outstanding, and four thousand five hundred and seventeen shares of such preferred stock held in the treasury of the defendant company. The total common stock outstanding is one hundred and fifteen thousand shares, with a par value of $11,500,000. The *Page 216 
preferred stock has the usual qualities to be found in shares so designated, entitling the owners thereof to the dividend indicated, if and when, declared, before the payment of any dividend upon the common stock, and it is then provided that accumulations of such dividends when deferred shall also be paid in advance of any dividend on the common stock, and that the preferred shall take precedence in the usual manner upon liquidation or dissolution. The accumulated arrears of dividends on the preferred stock now amount to $140 per share, although the surplus reserved by the company amounts to approximately $5,000,000 In this connection it should be said that neither of the bills is framed to compel a declaring of dividends, and no facts are alleged to bring the case within the language of Mr. Justice Swayze in Murray v. Beattie Manufacturing Co., 79 N.J. Eq. 604,
showing the right of the stockholders to such relief.
For the purpose, it is said, of reducing the capital debt of the defendant and make it more in reasonable proportion to the earning powers of the company, there was issued, on October 23d 1924, a notice of a special meeting of the stockholders of the defendant, for the purpose of passing upon a resolution of the board of directors designed to accomplish the same. It was proposed, according to the tenor of this notice and resolution, to seek an amendment of the certificate of incorporation of the company so that a new issue be created by changing thirty-five thousand shares of unissued preferred into thirty five thousand shares of a new class of preferred stock, denominated "cumulative prior preference stock," of a par value of $100 each, with an eight per cent. dividend, and to have priority both as to dividend and liquidation value over the preferred stock, already described, and redeemable at one hundred and fifteen per cent. after three years; also to reduce the authorized capital by canceling the remaining ten thousand shares of unissued preferred stock of the seven per cent. variety then remaining unissued. It was then proposed to cancel sixty thousand shares of the unissued common stock. Thus, *Page 217 
the new capital would consist of $3,500,000 par value of eight per cent. cumulative prior preference stock, $10,000,000 par value of the seven per cent. preferred stock and $11,500,000 par value of the common stock. And, finally, the stockholders were to be asked to permit the purchase of thirty thousand shares of the outstanding seven per cent. preferred stock for retirement, fifteen thousand shares thereof to be purchased from "a large banking corporation of New York City," which it now develops was the Chase Securities Corporation, a subsidiary of the Chase National Bank. The remaining fifteen thousand shares of such preferred stock it was proposed to purchase from the remaining stockholders, pro rata, based upon their respective holdings, at a price of $70 a share, in which connection it should be said that, under an agreement of August 13th, 1924, the price to be paid the Chase Securities Corporation was to consist of a fee of $25,000, a premium of $5 for each share of stock so secured, or $75,000, the administrative expenses of the Chase corporation in fulfilling its part of the contract, and such legal expenses as the last-named corporation should be put to in the premises. The average cost to the Chase corporation of accumulating such shares of stock amounts to $63.65, making the price due to the Chase corporation from the defendant $68.65, plus the pro rata
portion of the other charges to each share of stock, or, roughly, $70 per share.
The effect of the proposed plan, in the matter of reduction of capital indebtedness, may be synoptically expressed thus:
 Mode of payment.
To be extinguished for cash ....... $3,000,000 $2,100,000 in cash.
Accrued dividends thereon ......... 4,200,000
In exchange for new 8% stock ...... 3,500,000
Accrued dividends ................. 4,900,000 3,500,000 in new 8% stock.
 ___________ __________
 Totals ...................... $15,600,000 $5,600,000
 5,600,000
 ___________
 Reduction ................... $10,000,000
 *Page 218 
The vote at the stockholders' meeting showed a total of ninety-one thousand nine hundred and ninety shares of preferred and eighty-eight thousand six hundred and forty five shares of common stock in favor of the plan, or eight thousand three hundred and thirty-five shares of preferred and eleven thousand nine hundred and seventy-nine of common stock over the necessary amount. The value of the stock on the open market advanced from $29.75 per share in August, 1923, to $59 per share in August, 1924, when the contract between the defendant and the Chase corporation was executed, and, subsequently, advanced to $62.50 on October 10th, 1924.
Many of the points made by the complainants were presented to this court for decision in General Investment Co. v. BethlehemSteel Corporation, 88 N.J. Eq. 237, when Vice-Chancellor Lane commented on their novelty and importance. Because of the exigencies of the World War, he declined to pass upon them, but expressly based his determination upon a balancing of conveniences.
The complainants say that to permit preferred stock to be issued with an eight per cent. dividend, and redeemable at any time after three years at 115, exceeds the statutory maximum return upon such a class of stock, and converts it into preferred stock bearing a dividend at a rate of thirteen per cent. per annum. This, clearly, cannot be so, because the language of the very eighteenth section of the Corporation act, which limits the yield to eight per cent., contains the further provision that it may "be made subject to redemption at any time after three years from the issuing thereof at a price not less than par." The twenty-ninth section, it is true, says that the company may decrease its capital stock "by the purchase at not above par of certain shares for retirement." As Vice-Chancellor Lane pointed out in General Investment Co. v. Bethlehem Steel Corporation,supra (at p. 241), the legislature had two different objects in mind in framing the two different sections. It must be clear that in the eighteenth section it was its purpose to permit the company to impress upon such shares an *Page 219 
option in favor of itself to compel a shareholder to surrender up his stock at the end of three years, or such further period as might suit its convenience, for a sum designated, while in the twenty-ninth section it conferred upon the company authority to bargain for the purchase of stock upon which no such option existed, but, for obvious reasons, fixed par as the maximum it should be permitted to pay. There is no repugnance.
It is also objected that, included in the stock voted in favor of the director's plan, were the blocks acquired by the Chase Securities Corporation of fifteen thousand shares, and twenty thousand six hundred shares of preferred, and seven thousand seven hundred and thirty shares of common voted by a company named Livingston Company. It is said as to the former holding that, while the stock voted by the Chase Securities Corporation must be counted in the gross stock outstanding, it should not be permitted to be counted in favor of the defendant, because it was stock owned by the defendant, and, therefore, under the act, without voting power. The answer to this, as the defendant points out, is the opinion of the court of errors and appeals in U.S.Steel Corporation v. Hodge, 64 N.J. Eq. 807. But, the complainants say, in addition, if these shares be considered as the property of the Chase Securities Corporation, then they are not countable, because that company was voting its stock in favor of a contract for its own benefit. The answer to such objection is, that a stockholder is under no fiduciary relations either to the company or to his fellow-stockholders, and he votes his holdings in any way most advantageous to himself. Mr. Justice Van Syckel dealt with a like objection in the Hodge Case (at p.813 of the opinion). So far as the other holdings of stock are concerned, Livingston Company is a stock broker which had purchased, for various of its customers, the number of shares of stock mentioned for those customers' accounts, but had taken the legal title in its own name and so registered the shares on the books of the company. Sections 33 and 40 of the Corporation act, and the many cases decided under it, gave to Livingston *Page 220 
Company the privilege of voting as it did. Section 20, providing for a notation on the books of the company in case of hypothecating of stock, has nothing to do with the matter, that provision being intended to permit a transfer as collateral security without the owner parting with his right of franchise.
The main question raised and argued involves the matter of statutory authority to create a new class of preferred stock superior in its preference to the preferred stock now outstanding. The language of the resolutions refers to "reclassifying" thirty-five thousand shares of the unissued authorized stock, but, in effect, it would amount to inventing an entirely different creation than had been dreamed of when the certificate of incorporation was filed. It seems a most circuitous and awkward proceeding to go to the pains of reconstructing these nebulous, unissued shares into something entirely new, and neglect the direct proceeding of canceling them and then creating the new ones in the way presently to be pointed out. Call them what you may, they are an entirely new class of stock. The Standard Dictionary defines "create," in its secondary meaning, "to produce, as a new construction out of existing materials." If a narrow contruction is to be given the word "create" in the twenty-seventh section, then that is exactly the action contemplated, namely, to produce the prior preference stock out of the existing unissued preferred stock. But I prefer to consider these as a new class.
It cannot be questioned that, in the absence of fraud, ultravires action, illegality, or immorality, our courts will not substitute their respective judgments for that of the directors and stockholders in matters of business, and that has been the policy pursued from the case of Elkins v. Camden and AtlanticRailroad Co., 36 N.J. Eq. 241, to date. Thus, the resolution of the difficulty depends upon a construction of the pertinent provisions of the Corporation act of 1896, as it stood before the amendment of 1901. The language of section 18 provided that every corporation should have power "to create two or more kinds of stock of such classes, with such designations, preferences *Page 221 
and voting powers or restrictions or qualifications thereof asshall be stated and expressed in the certificate ofincorporation." Standing by itself, and considered as if there were no other provisions to be regarded, this would foreclose any corporation so circumstanced from subsequently creating any other class of stock after the organization of the corporate entity. But in the interpretation of statutes there is no rule better established than that the entire act, and every part thereof, shall, if possible, be given effect, and, so far as practicable, every provision thereof reconciled. James v. Dubois,16 N.J. Law 285; Morris and Essex Railroad Co. v. Commissioner ofRailroad Taxation, 37 N.J. Law 228.
In 1899, when the defendant was incorporated, the twenty-seventh section of the same act read as follows, so far as germane to this case:
"Every corporation organized under this act may change the nature of its business * * * create one or more classes of preferred stock * * * and make such other amendments, change or alteration as may be desired in manner following * * *."
These were the things it might do even though the original certificate made no provision for them. As to these things the shareholders were at liberty to change their minds. It then provided the familiar machinery of amendment upon a vote of not less than two-thirds in interest of each class of stockholders. The amendment of 1901, referred to above, added to the language of the eighteenth section I have already quoted fixing the power of the incorporators to provide for the various classes of stock, the following words: "Or in any certificate of amendment thereof." From this amendatory language the complainants draw the conclusion that such power of change was forbidden to the stockholders of the company under the law as expressed when the company was formed, and, therefore, on constitutional grounds not subject to change, for the reasons dealt with in Allen v.Francisco Sugar Co., 92 N.J. Eq. 431, and cases therein reviewed. As just intimated, if one were to close his eyes to everything in the act except the eighteenth section, this *Page 222 
position assumed by the complainants would be impregnable, but when read in light of the twenty-seventh section it becomes apparent that the legislature had no such thought or purpose in mind. The history of the act as originally drawn, and the scope and purposes apparent from a consideration of the entire instrument, show that the intention was to confer upon corporations organized pursuant to its provisions the broadest grounds of self-government consistent with safety to the public and fairness to all the stockholders. This being so, the unqualified permission granted by the twenty-seventh section to amend its certificate of incorporation so as to "create one or more classes of preferred stock" is to be read without qualification, except as otherwise expressed in the act or required by established rules and principles of law. Of course, such stock could not be issued under the original certificate unless provided for therein. But, then, the twenty-seventh section pointed out the means of amendment to remedy the oversight in the original certificate or to confer a power not thought necessary at first. The complainants say that this is authority only for the creation of a new class of preferred stock, subordinate in preferences to preferred stock already outstanding. The act does not say so, nor do the rights of the existing preferred stockholders make such a construction necessary. The twenty-seventh section in clear and unambiguous language provides for an amendment such as the one now under attack, and construing the eighteenth section amendment in light of this permission it can be nothing more than this, that as the language stood in 1899 every corporation should have the power to fix the qualities of its various classes of stock "as stated and expressed in the certificate of incorporation," with the understanding, however, that the certificate meant was the certificate in its form at the time of the issuance of the new class of stock. In contemplation of law the original form of certificate of a corporation is no longer the certificate of the company after an amendment has been made. When any amendment of a document is effected, whether that document be a pleading in a cause, a contract, a statute, or otherwise, the amendment becomes incorporated in, and a part of, *Page 223 
the document from that time forth, just as if included in the terms of the original language, and it was in this sense that the legislature spoke when it used the phrase "certificate of incorporation" in the original language of the eighteenth section of the act. It is illustrated by what is said in Dan. Pl. Pr.
(6th Am. ed.) § 402.
"But, although it is the practice to call a bill thus altered an amended bill, the amendment is, in fact, esteemed, but as a continuation of the original bill, and as forming a part of it, for both the original and amended bill constitutes but one record; so much so that, where an original bill is fully answered, and amendments are afterwards made, to which the defendant does not answer, the whole record may be taken, proconfesso, generally, and an order to take the bill proconfesso as to the amendments only will be irregular."
To the same effect is the opinion in Equitable Life AssuranceSociety v. Laird. 24 N.J. Eq. 319; affirmed, 26 N.J. Eq. 531.
Why the amendment to the eighteenth section was adopted I do not know. Perhaps, as counsel for the defendant intimates, at the instance of some over-cautious attorney who wished to "take a bond of fate." At any rate, it was unnecessary, and a surplus use of language. Not a rare mistake.
Pronick v. Spirits Distributing Co., 58 N.J. Eq. 97, does not support the argument of the complainants, but, in fact, is direct authority against them, under my reading of the Corporation act. In Smith v. Eastwood Wire Manufacturing Co.,58 N.J. Eq. 331, Vice-Chancellor Emery (at p. 333), after referring to the act becoming a part of every charter, says, in construing his own opinion in the Pronick Case:
"And in Pronick v. Spirits Distributing Co. * * * it was said that the same rule was to be applied to the general powers of amendment of certificates authorized at the time of organization."
Allen v. Francisco Sugar Co., supra, and all cases cited therein, and in briefs for complainants, dealt with attempts to carry out schemes declared to be unconstitutional invasions of property rights, and to attempt to apply them to the one at bar would be to argue in a circle. I referred to *Page 224 Chicago City Railway v. Allerton, 18 Wall. 233, in theGrausman Case. But there, there was an attempt, without authority from the legislature, to increase the capital stock from $1,250,000 to $1,500,000 by the directors, without permission from the stockholders. Day v. U.S. Cast Iron Pipeand Foundry Co. dealt with the right of a preferred stockholder to prevent payment of dividends on the common stock until withheld, available and earned dividends for previous years on the preferred stock should have been paid. There was no consideration of the company's right to amend for the purpose of creating a new kind of stock.
This being the state of the law, it became a part of the charter of the company, subject to which every one is presumed, to have purchased his stock. Meredith v. New Jersey Zinc andIron Co., 55 N.J. Eq. 211; affirmed, 56 N.J. Eq. 454;Schwarzwalder v. Tegen, 58 N.J. Eq. 319; Smith v. EastwoodWire Manufacturing Co., supra.
Therefore, the complaint of the minority stockholders is overborne by the statutory majority in favor of a change of the capital indebtedness sanctioned by law. For the reasons to which I have already adverted, I do not feel that I can give effect to the elaborate argument to show that the best methods have not been pursued to effect the desired result. It would be intolerable if this court should be charged with supervising the policies of every corporation as to their soundness, and, from the standpoint of the public, would be utterly subversive of the principle of majority rule. The complainants may suffer as they fear (only time can tell), but if, as I have decided, the law allows the change to be made, and did when the company was formed, then they should not expect assistance from this court, especially in view of their representing a rather small minority.
Much has been said of the abuse to which such a scheme as the one under consideration might be used to unfairly deprive preferred stockholders of their property by a continuance of the proceedings from time to time until individual stockholders would become "tired out," so as to dispose of their individual holdings at great disadvantage. I have no apprehension of any such proceeding, and I am positive *Page 225 
that there is no such motive now existing. If, in the future, the fears of the complainants in this respect are realized, any such attempt can be promptly and effectively suppressed. No extensive argument has been attempted here to show that the plan devised will be to the substantial benefit of all the stockholders of the company, for the reason that an examination of the condition of the company and the saving to be effected, as displayed in the statement of facts, must make it apparent to any disinterested person.
There has been expressed a further fear that the preemptive right of the present stockholders may not be observed in the distribution of the new class of preferred stock. As I said, in answer to a like objection in Grausman v. Porto Rican-AmericanTobacco Co., supra, the stockholders will have their remedy in that event.
There has been shown, however, a fact that places an entirely different aspect on the matter, and must operate to render nugatory all that was done at the meeting of stockholders. In the notice calling the meeting of stockholders, the latter were acquainted with the fact that it was proposed, among other things, to reduce the capital liability, provide for the issuing of a new class of stock, and the authorization to the board of directors to purchase for retirement, at not above par, thirty thousand shares of the then outstanding preferred stock at a price not above par, in one of several different methods. There was nothing said — and "there's the rub" — or any intimation given about the source from which the block of fifteen thousand shares were to be procured. There was in the president's letter to the stockholders information that the directors of the company had "made arrangement with a large banking corporation of New York City for the purchase from it by your company of fifteen thousand shares of preferred stock at a price of approximately $69 per share." No further information was given at any time to the stockholders of the identity of the banking corporation referred to or any of the officers or directors thereof. Upon the return of the order to show cause there was filed, on behalf of the defendant, the affidavit of Claude Douthit, one of its directors, in which it was revealed *Page 226 
that the banking corporation in question was the Chase Securities Corporation, and at page 8 of his typewritten affidavit it is said:
"None of the directors of the American Hide and Leather Company have any connection whatever with Chase Securities Corporation or with the contract referred to, except Mr. Edward R. Tinker, who is president of Chase Securities Corporation and a director of American Hide and Leather Company. Mr. Tinker, however, attended no meetings of the directors of the American Hide and Leather Company at which said contract or the said plan were considered."
Thus, it is made to appear by a part of the defendant's own proofs that Edward R. Tinker, at the time the contract was made with the Chase Securities Corporation, occupied the dual capacities of a director in the defendant corporation, and an officer in the company that was the other party to the contract providing for the acquiring of one-half of the thirty thousand shares to be purchased and retired. Mr. Justice Van Syckel, inUnited States Steel Corporation v. Hodge, supra (at p.813), said:
"The rule that directors cannot lawfully enter into a contract, in the benefit of which even one of their number participates
without the knowledge and consent of the stockholders, is so firmly entrenched in our jurisprudence that it is not open to debate." (The italics are mine.)
It is true that later, in showing that the illegal act had been ratified, and after demonstrating that such a contract is not void but merely voidable, he said:
"A fortiori, when the contract is entered into by the stock holders with the directors, or when the stockholders expressly authorize the directors to enter into a contract, when thestockholders had notice of the directors' interest, the agreement will be unassailable in the absence of actual fraud or want of power in the corporation." (The italics are again mine.)
In that case, however, it was pointed out that not only might it be fairly presumed that the stockholders knew that J.P. Morgan was a director of the steel company, but, in addition, that the circular letter which accompanied the call of the stockholders in that case expressly informed the latter, *Page 227 
not only that the contract was with J.P. Morgan Company, but that a syndicate had been formed, "including some directors, which will receive four-fifths" of the compensation to be paid the bankers. Then, applying the rule stated by Mr. Justice Dixon, in Gale v. Morris, 30 N.J. Eq. 285, it was pointed out that the stockholders were acquainted with all proper information long before they met, and were in a position to have made up their minds whether they would ratify the contract or denounce it by voting down the proposed resolutions. In the case at bar a very different situation is made to appear. It is disclosed that the plan under consideration was the fifth that had been devised, all previous ones having failed of approval, and, as Mr. Douthit says, this was the first one formulated "which proved to be satisfactory to the directors, counsel and bankers for the company." Of course, it requires small experience to know that projects of this importance are never launched without submission to counsel and his favorable opinion, yet, notwithstanding the rule of law "so firmly entrenched in our jurisprudence," and the emphatic expressions used by Mr. Justice Van Syckel in the leading case of U.S. Steel Corporation v. Hodge, supra, there would appear to have been some reason for suppressing and withholding from the stockholders the information that one individual joined hands on the one side with the directors in their fiduciary relations to the stockholders (Marr v. Marr,73 N.J. Eq. 643), and, on the other, with the syndicate which was dealing at arm's length with the corporation in which the shareholders had invested their money. It is true that Clarence Venner, the president of the complainant, General Investment Company, in his quest for particulars about the circumstances surrounding the scheme, met with many obstacles and some rebuffs at the hands of the defendant's officer. Some allowance must be made, however, for the weakness of human nature, and I can conceive of no monster of the jungle, or the most vivid imagination, that could unsettle the nerves of a corporation director when engaged in rejuvenating an embarrassed company, as the appearance of Mr. Venner in search of information (observation of vice-chancellor *Page 228 
in Bethlehem Steel Corporation Case, supra.) There is nothing to make it appear that any other stockholder was so treated. I do not believe the information about Tinker was withheld by any active fraud. Whether so or not, to permit such a violation of so salutary and necessary a rule of law would be, if consistently followed, to throw open the savings of investors to practices that would destroy all public confidence in the value of corporate stock.
It is established in Stewart v. Lehigh Valley Railroad Co.,38 N.J. Law 505, that courts will not inquire whether a contract such as this seems a fair one. "Fraud is too cunning and evasive for courts to establish a rule that invites its presence." The same case and the many authorities there cited are also an answer to the protestation that the director took no part in the negotiations under attack. Mr. Justice Dixon, in the last-named case, says:
"Nor is it proper for one of a board of directors to support his contract with his company upon the ground that he abstain from participating as director in the negotiations for the final adoption of the bargain by his co-directors, the very words in which he asserts his right declares his wrong; he ought to have participated, and in the interest of the stockholders, and if he did not, and they had thereby suffered loss, of which they shall be the judges, he must restore the right he has obtained — he must hold against them no advantage that he has got through neglect of his duty toward them."
It is true that in that case the director in question dealt with himself as a member of a partnership, but the principle would apply equally had he been an officer of a corporation with which he was contracting in his quasi-trust capacity. No one can read the opinion of Mr. Justice Dixon in the Stewart Case, or consider the reason for the rule, and not regard as puerile any such transparent effort as to attempt concealment behind the form of incorporation. The rule is one of a stern morality.
The rule is rigid and applies equally to cases of fair and of unfair dealing, and where the principal would have been no better off if the agent had strictly pursued his powers, and *Page 229 
where the principal was not, in fact, injured by the agent's act.Meach. Ag. § 469.
As an officer of the Chase Securities Corporation he would have profited, it is immaterial whether much or little, directly or indirectly, by a hard bargain with the defendant.
However, in face of the large majority in favor of the new plan of capitalization, the otherwise apparently hopeless condition of the company, the advantage to be obtained for the great mass of stockholders by bringing the finances of the company at least one step nearer to the resumption of dividends, and the fact that I do not believe there was any conscious attempt to suppress information from stockholders, I feel that an opportunity should be afforded the defendant to repair the neglect with which I have just dealt. Therefore, I will withhold action for a period of ten days from the mailing of this opinion, so that if the defendant shall desire, it may give notice to the stockholders of another special meeting, for the purpose of again passing upon the resolution of the board of directors which have given rise to this suit. With such notice, or incorporated therein, there shall be given the information already withheld, to wit, the name of the Chase Securities Corporation, and the fact that Mr. Tinker was a member of the defendant's board of directors and the president of the Chase Securities Corporation at the time the contract was executed, as was done in the Hodge Case (at pp.814, 815.) Of course, new proxies must be obtained after this information shall have been conveyed to the stockholders, and no proxy executed prior thereto shall be voted. Should the stockholders again adopt the resolutions of the board, I shall refuse any preliminary injunction. It may be said that the defendant will be placed at some disadvantage in again securing proxies to adopt the resolution by the necessary majority. If that be so, it has itself to blame for a failure to perform its duty, and it would perhaps be strong proof of the strength of the position of the complainants.
On the other hand, if the defendant shall not have availed itself of this opportunity within the time limited, I will advise a preliminary injunction in accordance with the prayers of the respective bills. *Page 230