[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 519 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 520 
The plaintiff holds 300 shares of the preferred capital stock of the defendant company. The total number of such shares, presently issued and outstanding, is 12,122. Those shares are of the par value of $30.00 each and entitle the holders to cumulative dividends at the rate of 7% a year. Also presently outstanding are 238,299-3/5 shares of the company's common stock, originally of the par value of $10.00 and now, by reason of the reduction hereinafter mentioned, of the par value of $1.00 each. The said two classes of stock were authorized by the company's certificate of incorporation, filed on September 26, 1927. Dividends on the preferred stock were paid to and including the installments due on August 1, 1931. *Page 521 
No dividends have been paid since that date and as of December 31, 1948, there were unpaid and in arrears 69 quarterly dividends at the rate of 1-3/4% each. Those cumulative and unpaid dividends amount to $36.22 1/2 per share and to $439,119.45 on the entire outstanding issue of preferred stock. During this period of default no dividends were paid on the common stock. It is not disputed that the company's failure to pay dividends during this period of over seventeen years was due to insufficiency of earnings; that for many years within that period the defendant company's business was operated at a deficit, which deficit was charged off against capital surplus created in 1932 by reducing the par value of the common stock from $10.00 each to $1.00 each. This $9.00 reduction in par amounted to $2,249,809.74. In 1932 that amount was transferred from capital to capital surplus and against that capital surplus was charged off each year the company's operating deficit. Thus the impairment of capital was avoided. The financial statement of the company as of the end of 1948 shows that its total assets amount to $2,280,865.79 and that its true net worth amounts to $1,248,663.64, of which $580,299.60 represents its capital and $668,364.04 represents its capital surplus. As already indicated, this surplus does not reflect any earnings of the company but is what remains of the result of the reduction in 1932 of the par value of the common stock from $10.00 to $1.00 per share.
On September 30, 1948, the directors of the company inaugurated what has been called the "plan of conversion" for the purpose of satisfying, and thus eliminating, the dividends in arrears on the preferred stock. The plan was to change and convert each of the presently outstanding 12,122 shares of 7% cumulative preferred stock, with a par value of $30.00, together with all accumulated and unpaid dividends accrued and in arrears thereon into one full paid and non-assessable share of 5% Cumulative Prior Preferred Stock of the par value of $50.00, and upon such conversion also to pay in cash to the preferred stockholders $2.50 for each share of the old preferred stock converted into the new preferred stock. The plan was declared advisable by a resolution of the board of directors, *Page 522 
under which the capital structure of the company was by amendment to its certificate of incorporation to be reclassified, so that it would consist, as heretofore authorized, of 300,000 shares of common (same being inclusive of its presently outstanding shares of common stock) of the par value of $1.00 each and a new issue of 12,122 shares of 5% Cumulative Prior Preferred Stock of the par value of $50.00 each. The proposed amendment included certain other new features intended for the benefit and greater protection of the holders of the preferred stock.
At a duly called stockholders' meeting held on January 17, 1949, the Board's resolution, proposed amendments to the charter, and the entire underlying plan of conversion were considered by the stockholders of both classes. Fifty-five preferred stockholders holding in the aggregate 10,493 shares of preferred stock voted in favor of the resolution, the amendments and the plan of conversion. Only twenty-two persons holding 1629 shares of preferred stock did not appear or vote. No negative votes were registered. Of the holders of the common stock one hundred thirty-nine persons holding 181,583-1/10 shares voted in favor of the proposed project. There were no negative votes. Thus 86.56% of the preferred stock and over 76% of the outstanding common stock voted in favor of the plan of conversion. This was substantially more than the two-thirds vote required by the statute (R.S. 14:11-1,-2,-3).
The complaint alleges that at the conclusion of the stockholders' meeting the defendant's president, who presided thereat, announced that the plan of conversion was effective and was binding upon all the holders of the company's stock. The plan itself, transmitted to the stockholders in advance of the meeting, clearly indicates the intent to make the plan mandatory. It is clearly stated that when the certificate of amendment is filed, the holders of the existing preferred stock would be required forthwith to surrender such stock for cancellation and that thereupon the new stock would be issued and the cash payment made, and that after the date of such filing the holders of the old preferred stock "shall have no further or other rights or interest by reason of the ownership thereof, except such as *Page 523 
arise from the right of such holders to receive, upon such surrender of such certificates, certificates for an equal number of shares of the 5% Cumulative Prior Preferred Stock and also the cash payment hereinafter provided" ($2.50 per share).
Plaintiff attacks the plan of conversion as both illegal and unfair and charges that the plan violates not alone his rights as a preferred stockholder but also the rights of those other preferred stockholders who did not assent to the plan by voting therefor. The plaintiff asks for a judgment declaring the plan of conversion illegal and inequitable as against the non-assenting preferred stockholders and he seeks injunction against the plan being enforced against him and them. The other non-assenting preferred stockholders are before this court by force of its order appointing the plaintiff as the representative of the whole class of non-assenting preferred stockholders and directing that the plaintiff give notice to the others of the nature and pendency of this action and of the opportunity afforded by the Court to intervene within twenty days after such notice is given. The notice was duly given but no other preferred stockholder intervened.
Is the plan of conversion illegal as against plaintiff and the other non-assenting preferred stockholders or is it binding upon all of them? Plaintiff argues that the certificate of incorporation of the company constitutes a contract not alone between the company and all its stockholders but also between the stockholders inter sese, that that contract assures to the holders of the preferred stock the ultimate payment of the accumulated and unpaid dividends, that the dividend rate is similarly assured and may not be reduced, that the foregoing rights constitute vested property rights which may not be altered or impaired by any number of stockholders less than all and that such immunity may be invoked by a single dissenting stockholder. With this general statement there can be no quarrel, but it has no application to the case at hand. That the company's charter constitutes a binding contract is so uniformly established and recognized that it would be quite idle to furnish the authorities in support of it. Equally settled, however, is the rule of law that every corporate charter is granted with reference *Page 524 
to the state of the law at the time the charter is issued and that, unless the instrument itself contains language to the contrary, there is present in each charter by legal implication every right and power, as well as disability, expressed in the then prevailing law applicable to such a corporation. The legislative act under which a charter is granted is an integral part of the charter itself as fully as though it were literally incorporated in the charter. In Gen. Invest. Co. v. Amer. Hide Leather Co., 97 N.J. Eq. 214, at 224, the Court of Chancery held that upon the incorporation of a company the existing state of the law becomes part of the charter of the company, "subject to which every one is presumed, to have purchased his stock." When that case was reviewed on appeal (98 N.J. Eq. 326,129 A. 244), Chief Justice Gummere, in writing the majority opinion for the Court of Errors and Appeals, said:
"It is further argued in support of this point that the proposed change is not permitted by the articles of incorporation; that those articles constitute a contract between the stockholders inter sese, which cannot be altered except by the unanimous consent of such stockholders. The answer to this argument is that the fifth section of the statute declares that `this act shall be a part of the charter of every corporation * * * hereafter formed hereunder;' and that, consequently, the twenty-seventh section of the act, the scope of which we have discussed, is in an integral part of the stockholders' contract, and, so, is binding upon every stockholder."
The fifth section, lastly referred to, is now R.S. 14:2-8.
When the defendant company was incorporated in September, 1927, the prevailing state of the law on the plan of conversion here involved was reflected in an amendment and supplement enacted in 1926 and what is now 14:11-1-2-3. It provided, amongst other things, that any corporation could (a) "Create one or more classes of preferred or prior preference or other special stock;" (b) "Provide for funding or satisfying rights, in respect to dividends in arrears by the issuance of stock therefor or otherwise;" and (c) "Make other provisions for the readjustment or reclassification of all or a part of its capital stock". These three powers were the result of an amendment and supplement to the General Corporation Act which became effective on March 31, 1926, *Page 525 Chapter 318, Laws of 1926, p. 529. The powers last enumerated were, however, subjected to express limitations. Those pertinent to this case are that no corporation having outstanding any preferred stock could (1) reduce the dividend rate, (2) reduce the right to cumulative dividends, or (3) provide for funding or satisfying rights in respect to dividends in arrears on its preferred stock unless two-thirds in interest of the holders of the preferred stock should vote in favor of the change. The proofs before the court establish that the required vote was given to the changes here under attack. It is plain that the company's right to make the change by the required statutory vote was an integral part of the contract, subject to which the plaintiff and all the other stockholders purchased their shares and by which they are bound.
Plaintiff's counsel in his brief refers to Lonsdale, c., v.International, c., Co., 101 N.J. Eq. 554, 139 A. 50. There it was held that where the preferred stockholders have become vested with the right to share in an existing surplus to the exclusion of the holders of the common stock, equity would not permit the majority of the stockholders to deprive a nonconsenting preferred stockholder of that right. The controlling circumstance in that case was that there the defendant company had been incorporated in the year 1902. Tested by the state of the law which existed in 1902, the proposed reorganization in the cited case offended the Corporation Act and sought to divest rights which the statute in its then state did not permit to be disturbed. Plaintiff also has relied on Wesselv. Guantenamo Sugar Co., 134 N.J. Eq. 271, 35 A.2d 215, affirmed 135 N.J. Eq. 506, 39 A.2d 431. There a reorganization plan proposed to convert preferred stock of $100.00 par by giving to each such share a debenture of $40.00 and 14 shares of new $5.00 par value common capital stock. It was held that although the company could under the existing statute change its preferred stock into common stock, it did not have the power to destroy the cumulative portion of the contract held by preferred stockholders to be paid their dividend arrears. Here, too, the determinative fact was that the corporation was organized in 1905 and the preferred stock authorized by charter *Page 526 
amendment in 1922, both dates being before the 1926 amendment and supplement (above mentioned) came into effect. It is quite clear that had the defendant company in the cited case been created subsequent to the 1926 amendment and supplement, the reorganization plan there advanced would have been well within the corporate power.
One other case cited by plaintiff is that of Buckley v. CubanAmerican Sugar Co., 129 N.J. Eq. 322, 19 A.2d 820. There it was held that the corporation may provide for "funding or satisfying rights," in respect of dividends in arrears, by the issuance of stock therefor, but that such action must preserve vested rights and contractual obligations and that the existing certificate of incorporation of the defendant company created a contract between the company and its stockholders in which the latter are vested with property rights of a fixed and determinate value, for which there could not be substituted, over the objection of any stockholders, rights of lesser value. The significant fact in that case is that the company was incorporated in 1906, long before the 1926 amendment gave to corporations the express power of satisfying dividends in arrears by issuing stock therefor "or otherwise".
In the case sub judice the plan of conversion would wipe out the dividend arrears of $36.22 1/2 accumulated on each share of preferred stock. As against that result the par value of the new preferred stock would stand raised from $30.00 to $50.00. The differential of $20.00 would become immediately an additional base for the computation of dividends. In other words, a preferred stockholder would have a $50.00 principal investment to which the dividend rate would be applied. True, the dividend rate on the old stock was 7% while the proposed rate on the new stock is 5%, but the reduced rate of dividend would, however, produce for the investor a greater dollar yield than the former higher rate. Under the new stock he would receive 5% of $50.00, or $2.50, as against 7% of $30.00, or $2.10. In addition to that beneficial change, each stockholder presently receives on the conversion $2.50 in cash per share. Cumulatively the preferred stockholders receive $52.50 (in stock and in cash) against their present claim of $66.22 1/2 *Page 527 
(the $30.00 par plus the $36.22 1/2 dividend arrears). Mathematically the differential is $13.72 1/2 but it is more than offset by the advantages flowing from a present cash payment plus a new security unencumbered by dividend arrears which, from the proofs before me, could not be satisfied for many years to come and then only if the present real estate market continues energetic and office space continues to be greatly in demand. The defendant's principal asset and source of revenue is the Military Park Office Building in the City of Newark, which only during the current period of real estate prosperity has operated at some profit. That holding represents 86% of the company's gross assets. The pronounced advantages of the plan have strongly appealed to stockholders having large blocks of the old preferred stock, who urged upon the company's officers the plan as one which would furnish immediately some cash to the stockholders and, in the form of new stock, a much more desirable and marketable security than the existing stock with its heavy load of accumulated unpaid dividends, which accumulations the company has no present capacity to pay and has only remote hopes of paying in the future. I am also impressed with the very preponderant number of stockholders in favor of the plan and with the further fact that the plaintiff, who holds only 300 shares, is the only objector. He argues that the company should be held to the payment of the accrued dividends since, as he claims and the proofs show, it has a surplus of $668,364.04, substantially more than the total of all unpaid dividends. This claim overlooks the fact that that surplus is purely a paper asset, artificially created many years ago by the reduction of the par value of the common stock from $10.00 to $1.00 per share. It is not supported by cash or liquid securities. The company's financial statement shows that it had at the end of 1948 $190,000 in cash, out of which will be carved the cash payment required by the plan of conversion. The retention of the remaining cash for operating expenses, to meet amortization of mortgage, to furnish a reserve for future dividends, and for other corporate purposes is something that is committed to the sound judgment and good faith of the directors. With *Page 528 
matters of business policy and discretion, exercised in good faith, the courts will not interfere. There has not been in this case the slightest intimation of bad faith. On the contrary, plaintiff's counsel stated to the court that the conversion plan was undoubtedly adopted in good faith but that the plaintiff could not be bound without his present specific assent. I have already indicated that by force of his contract he is bound by the action taken, for he has by implication of law agreed to be bound in the particulars here involved by the action of two-thirds of his fellow holders of the company's preferred stock.
I have here gone into the details of the plan in respect of its apparent advantages. This was done only because the plaintiff claimed the plan to be unfair. My attention to that complaint is not to be misunderstood. The fairness or unfairness of corporate action may not be considered where that action is in exercise of a power conferred upon the corporation by the Act under which it was organized. In Gen. Invest. Co. v. Amer. Hide Leather Co.(supra), it was stated by the Court of Errors and Appeals that even injury to the preferred stockholder cannot operate to nullify the corporate power conferred by law, that "The power thus conferred is only curtailed by those other provisions of the statute which declare the limits beyond which the corporation may not go in issuing such new stock", and that "the power thus broadly conferred by the legislature is not to be limited by judicial decision." I have considered the matter of the fairness of the plan only because it was strongly assailed and as vigorously defended. In view of the plaintiff's admission that the plan was conceived in good faith, I believe it to be fairly due to the directors of the company to clear them of the charge that they acted unfairly and unjustly. My view is that the plan is not only fair but decidedly advantageous to the preferred stockholders.
The defendant has asked for summary judgment on the pleadings and proofs before the court. None of the facts is in dispute. The plaintiff seeks both an injunction and a declaratory judgment. The defendant resists the injunction but prays *Page 529 
for judgment declaring the plan both legal and fair and one mandatory and binding upon the entire class of preferred stock-holders, which can mean, of course, only the non-assenting stockholders. Those who assented are not within this contest. The injunction sought by plaintiff will be denied and a judgment may be entered for the defendant declaring the conversion plan lawful and fair and mandatory and binding upon the plaintiff and all other non-assenting holders of the company's preferred stock.