HENRY C. PITNEY, JOHN R. EMERY, ALFRED REED,
FREDERIC W. STEVENS AND MARTIN P.
GREY, VICE-CHANCELLORS.

———

WILLIAM T. MEREDITH et al.

*v.*

NEW JERSEY ZINC AND IRON COMPANY, THE LEHIGH
ZINC AND IRON COMPANY, THE PASSAIC ZINC COM-
PANY, THE HARDYSTON MINING COMPANY et al.

1. A preliminary order will not be granted to restrain a corporation, organ-
ized for mining and reducing ores owned by it within the state, from entering
into a contract for the purchase of similar mines lying outside the state, since

211

Meredith *v.* Zinc and Iron Co.

the purchase may be made and the contract carried out, and the corporation still be at liberty to discontinue the operation of work outside the state, if it be a breach of the original contract between the stockholders.

2. Where a mining and manufacturing corporation was organized under the Corporation act of 1875, which provides (section 55) for the purchase of property with stock, such provision became a part of the contract between the stockholders; and where new stock is issued for the purchase of mines, which will become a part of the common property, from which all stockholders will receive the same benefit, original holders cannot insist that the new stock shall be issued to them in the proportion their holdings bear to the whole amount of stock before the increase.

3. In case the corporation deprives a stockholder of his rights in this behalf, it is liable to an action at law for damages; and where it is of sufficient responsibility to answer to such action, the stockholder is not entitled to equitable relief.

4. Rival corporations became interested in the same mineral deposit, on the supposition that two different ores, found in the same veins, could be separated, the two having been sold, one each, to the two corporations. To define and separate the two ores, in practice, in the earth was found practically impossible. Disputes arose as to whether the various veins uncovered were one ore or the other, and prolonged and expensive litigation followed, extending over many years. Finding that the issue was incapable of satisfactory judicial determination, a contract was made whereby the rival interests were to be consolidated, but as a condition precedent it involved the purchase of other mines and plants in different parts of the state and country. The corporations exercised no public franchise, were simply the owners of a species of property which, in its natural state, is of no use to mankind, and their output comprised but a small fraction of the product of the country.—*Held*, that the contract did not tend to create a monopoly.

Motion for injunction. On bill and affidavit in support of the motion; on a single affidavit opposed.

*Mr. John F. Dillon* (of New York), *Mr. Joseph Coult* and *Mr. James E. Howell*, for the complainants.

*Mr. John L. Cadwalader*, *Mr. George W. Wickersham*, *Mr. F. J. Mather* (all of New York), *Mr. Richard V. Lindabury*, for the defendants.

PITNEY, V. C.

The complainants are, severally, the owners of certain shares of stock in the New Jersey Zinc and Iron Company, and seek

by their bill to enjoin the performance of a contract entered into by that company with the other defendants.

The New Jersey Zinc Company was organized in 1880, under the General Corporation act of this state, and the purposes and objects of the corporation and places where its business is to be carried on are designated as follows in the certificate of organization :

"The places where the business of the company is to be carried on are the county of Sussex, in the State of New Jersey; the city of Newark, in the county of Essex in said state, and in the city of New York, county and State of New York."

The objects are

"the mining of zinc and iron ores and other ores and mineral substances; the manufacture and sale of the products of such ores and minerals; the purchasing, leasing, holding and selling such real estate, machinery, mines and mineral rights and merchandise and other personal property as may be deemed necessary or convenient for the prosecution of the above-mentioned business."

The business of selling the manufactured product of such ores and minerals out of the state was to be carried on " in the said city of New York, and the principal part of such business within said state is to be transacted in the said city of Newark." The capital stock was fixed at $3,040,000, divided into thirty thousand four hundred shares of $100 each. The complainants are the holders of two hundred and ninety-one of these shares, a little less than one per cent. of the whole.

The contract whose performance is sought to be enjoined was submitted to a meeting of the stockholders called for that purpose, and received the approval of about eight-tenths of the whole. There is no room for the inference that each and every stockholder so approving did not have the opportunity to examine and consider the propriety of the contract and to exercise an intelligent judgment upon it. There is no room for inference that there was any mistake or any fraud, actual or constructive, in the procuration of the contract. There is no room for the suspicion even that the case presented has any of the features of those cases, unfortunately quite numerous in these days, where

a bare majority of the stockholders in one corporation use their power to make a contract with another corporation in which they are more largely interested, which is very advantageous to the latter and disadvantageous to the former. In short, there is no room to suspect even that there is the least element of a party making a contract with itself.

It follows that the general wisdom and propriety of the contract, having been approved by so large a majority of the stockholders, cannot be called in question here, and so much of the allegations of the bill and arguments of counsel as are based upon the idea of its improvidence and unsupported by any proof must be disregarded.

However, in order to appreciate the value of the attack on the contract based upon other grounds presently to be mentioned, it is worth while to state generally the origin and object of it.

The defendant the New Jersey Zinc and Iron Company and the defendant the Hardyston Mining Company, very recently successor in title to the defendant the Lehigh Zinc and Iron Company, are severally the owners of certain mineral rights situate at a place called Mine Hill, in the Wallkill valley, in the county of Sussex. The mineral which they own is called franklinite and contains zinc, and its value consists in the presence of that mineral in it. It was discovered some fifty or sixty years ago, and when first discovered, and before the lodes or veins in which it was found were developed, it was supposed that there were two distinct minerals so situate that they could be separately owned and mined, namely, zinc and franklinite, the latter a peculiar mixture of mineral substances which takes its name from the village of Franklin, near which the veins are situate. Based upon this supposition, the titles to the two different minerals found in the same lodes or veins, at the place here in question, were separated. The right to mine the zinc ore was sold by itself, and the right to mine the franklinite ore was sold by itself.

But when an attempt was made to define and separate, in practice, the two ores in the earth, it was found that it was practicably impossible, and a serious dispute at once arose whether the

various veins or portions of veins which were uncovered were franklinite or zinc.

This state of things has led to a series of litigations in the state and federal courts, with varying results, which, I may here say, were not at all referred to in the bill, but in argument counsel for defendants relied, and I think properly, upon the common knowledge of the bench and bar of this state, derived from the official reports of the various suits, for a history of this controversy.

Before adverting to those reports it is proper to say that the defendant the New Jersey Zinc and Iron Company is the successor in title to the New Jersey Zinc Company, organized under a special charter about the middle of the century, and which became entitled to the "zinc" ore in the tract called Mine hill.

The title to the "franklinite" in a district known as the south half of Mine hill became vested in one party, and that of the franklinite in the north half became vested in another party.

The first suit was between the old New Jersey Zinc Company and the owner of the franklinite on the south half, and that resulted, first, in a victory for the franklinite company, as reported in *2 Beas. 322*. That decision was reversed, on appeal, in *2 McCart. 418*, and the title to both ores in effect apparently vested in the zinc company. That was in 1862.

Under that decision the old zinc company prosecuted its business upon the south half of Mine hill until some time in the next decade, when a party holding an unsatisfied mortgage on the franklinite in the south half, who was not a party to the previous litigation, foreclosed his mortgage, obtained the title and commenced a suit in the federal court against the New Jersey Zinc Company, which resulted adversely to that company. The result of that litigation was that the present New Jersey Zinc and Iron Company was organized, and the two warring titles to the franklinite and the zinc ores were conveyed to the new company, whereby it became the undisputed owner of all the ores in the south half of Mine hill and of the zinc ores on the north half.

In the meantime the franklinite on the north half became

vested in the Lehigh Zinc and Iron Company, and about nine years ago the New Jersey Zinc and Iron Company commenced suit against the Lehigh Zinc and Iron Company to establish its title to the north half, which suit, with varying fortunes in the courts, was finally decided against the New Jersey Zinc and Iron Company in November, 1896.

This decision, however, covered only a part of the north half of the hill. Another undeveloped vein of the ore still remained unaffected by the decision.

In this state of things negotiations were entered into between the parties for the purpose of settling the litigation by the purchase by one party or the other of the opposite interests.

The Lehigh Zinc and Iron Company, which had been taking out ores on the north half of Mine hill, sent them to Bethlehem, Pennsylvania (where they had a large establishment for that purpose), to be treated and made marketable, precisely as the New Jersey Zinc and Iron Company sent their ores to Newark, New Jersey, where they have a large establishment for that purpose.

The Lehigh Zinc and Iron Company also had a zinc mine near their works in Pennsylvania, and refused to sell or consolidate unless the settlement included all of their plant and its offshoots.

There was a third company, the defendant the Passaic Zinc Company, which owned a franklinite mine near Mine hill, in Sussex county, and works on the Hackensack river for utilizing its products. The controlling stockholder in that company, a Mr. Jones, interested himself in bringing about a settlement of the controversy between the New Jersey and Lehigh companies, and proposed to sell his works and mines at the same time.

Much the greater value of all the works combined was found in the mines owned and controlled by the New Jersey Zinc and Iron Company and the Lehigh Zinc and Iron Company.

The Passaic Zinc Company also had a mining and reducing plant in Wisconsin and another in Illinois, of more or less value, and Mr. Jones insisted that these plants should go with the sale of the Passaic zinc works.

The sworn statement of the president of the New Jersey Zinc and Iron Company is to the effect that the situation of affairs was such that it was found impracticable to effect a settlement of the controversy arising out of the difficulties in the title without buying up all of these works. With that view the contract in question was entered into, which was preliminary in its nature and depended upon the results of an investigation of the titles of all the properties and of the value in particular of the mines in Sussex county. Eminent experts, entirely indifferent between the parties, were chosen to appraise their value, and fixed them at a very high figure.

The price to be paid by the New Jersey Zinc and Iron Company for all these properties was (roughly) $1,250,000 in cash and the issue of thirty-two thousand nine hundred and thirty-four shares of stock, of $3,293,400 par value, to be distributed among the different owners.

The Lehigh Zinc and Iron Company and its appendages, including the Hardyston company, are owned almost entirely by four individuals—Messrs. Richard and August Heckscher and S. P. and J. P. Wetherill. The Wetherills also own certain interests in some patent rights, which pass with the sale.

In order to legitimatize the future operations of the company at points outside of the state and to make the necessary increase of capital stock, the same meeting of stockholders, which by a vote of about eight-tenths of the whole approved the contract, approved a change in the certificate of organization, by which the company was enabled to mine and manufacture outside the state and to buy and hold stocks &c. and to increase its capital stock.

This exposition of the circumstances and real objects of the contract is made so that the objections urged by the complainants may be the better understood. They are as follows:

*First.* That the transaction is a violation of the charter rights of the company and the contract rights between the stockholders in the following particulars:

(a) In attempting to buy out wholesale interests in a large

number of corporations, for which they agree to pay a sum larger than their whole capital.

(b) In attempting to go into the mining and manufacturing business outside of New Jersey.

(c) In attempting to extend the business to points within the state which are not included in the original agreement.

*Second.* That the proposed consolidation will result in the creation of a monopoly, and thereby render the complainants' stock and rights liable to forfeiture at the suit of the state.

*Third.* The manner of increasing and distributing the increased capital stock is objected to, the particular ground of this last objection being that any increase of capital stock must be divided among the present holders of stock in proportion to their holdings.

It is conceded on all hands that the original certificate of organization of this company forms a contract between the several stockholders, which, except by unanimous consent, cannot be affected by any change in it made by virtue of any subsequent act of the legislature, but that it can only be effectually changed by virtue of some act of the legislature then in force, which can and should be, so to speak, read into the contract.

It is conceded that sections 6 and 35 of the Corporation act of 1875, which was in force when this corporation was formed, cannot properly be so read into the certificate. Those sections reserve to the legislature the power to recall, in whole or in part, the legislative grant of corporate existence and immunity, and to annul the contract between the state and the corporation, but do not give the right to the corporation, or a majority of its stockholders, to alter the contract entered into between them except by the consent of each.

But it is further conceded that section 24 of that act, which provides for an increase of the capital stock, and section 33, which provides for a change in the nature of its business by the vote of two-thirds in interest of the stockholders, and section 55, which provides for the purchase of property with stock, must be considered as a part of the certificate of organization, and hence constitute a part of the contract between the stockholders.

Meredith *v.* Zinc and Iron Co.

The proposed change in the contract which was principally relied upon by counsel of complainants, was the purchase of property and carrying on of business outside the state. With regard to this matter, it is enough to say that I do not find it necessary, for present purposes, to determine whether or not it will be a breach of the contract between the stockholders for the company to proceed to prosecute mining and manufacturing enterprises outside of the state, since that is not a necessary part of the contract, as I read it, or if it be, the entire purchase may be made and the contract carried out, and the company still be at liberty to discontinue the operation of work outside of the state. The purchasing of these plants and works outside of the state is not an irretrievable step, which will commit the company irrevocably to an enterprise the prosecution of which will be a breach of the original contract between the stockholders. For that reason I think that the determination of that question may be properly deferred until the final hearing of the cause.

No great or present injury will result from the prosecution of the work pending suit, and hence it is not a case for preliminary restraint by the court.

This removes at once the principal objection made by the counsel of complainants to the execution of this contract.

With regard to the power to execute the mortgage, that is found in the fourth subdivision of the first section of the act.

The ownership of the mines in this state and the working up of their product are, of course, directly within the original purpose of the act.

The power to increase the capital stock is found in the twenty-fourth section of the original act, in these words:

"In case more capital is necessary, an additional certificate shall be filed under the hands and seals of two-thirds in interest of the stockholders or their legal representatives, stating the amount of such additional capital required."

The power to so increase its stock—and that it had been effectively done in this case—was not disputed by the counsel of complainants in their brief or in oral argument, so that the regularity of the proposed increase is not drawn in question.

The only point made in that connection was that when a block of increased stock is issued, each of the old holders is entitled to such a proportion of it as his holdings bore to the whole amount of stock before the increase, and that complainants' rights in that behalf are about to be invaded.

At the argument, counsel for defendants offered to the complainants to insure to them the right to purchase at par such proportion of the new stock as they would be entitled to under the rule relied upon.

But casting out of view that offer, two answers are made to the objection by the defendants—*first*, that the fifty-fifth section authorizes the issuing of stock for the purchase of property, and that that section, which must also be read into the contract between the stockholders, overrides the general rule invoked; and *second*, that the general rule (if there be such) requiring an equal distribution of new stock was adopted by the courts for the purpose of preventing any particular stockholders or clique of stockholders from appropriating to themselves the right to subscribe to new stock at par when such privilege is worth a premium. *2 Beach Priv. Corp. § 473; Gray v. Portland Bank, 3 Mass. 364.* In the case in hand, as the stock is issued for the purchase of property which will become a part of the common property, and from which the dissenting stockholder will receive the same benefit, if any, as each of his associates, I can see no reason for the application of the rule in this case. The amount of stock to be issued to the parties interested in the properties to be conveyed was fixed upon the basis of their actual value.

The parties dealt at arm's length, and, as before observed, there is no reason to suspect that there is here the least element of a party making a contract with himself. Besides, it is well held in such cases that in case the corporation deprives a stockholder of his rights in this behalf, it is liable to an action at law for damages, and there is no suggestion that the zinc company is not of sufficient responsibility to answer to such action.

For these reasons, I think the complainants are not entitled to relief on that ground.

It remains to consider the question of illegal combination

which would subject the new corporation to an attack by the attorney-general. Upon such consideration as the four days allowed me for that purpose have permitted me to give the subject, I think that there is nothing in that ground.

The circumstances show that it is not the object or purpose of the contract to create a monopoly. The affidavit of the president of the New Jersey Zinc and Iron Company shows that the zinc ores which will be controlled by it after these several purchases constitute but a small fraction of the world's supply, and that its product of zinc will also be but a small fraction of that produced throughout the country. Besides, buying up by one corporation of the property of another, and consolidating the whole into one business to the extent and in the manner provided for in this agreement is not, in my judgment, contrary to public policy, nor does it tend to create a monopoly. The question was carefully examined by Vice-Chancellor Green in *Ellerman* v. *Stock Yards,* *4 Dick. Ch. Rep. 217,* and that opinion was reviewed and reaffirmed in the subsequent case of *Willoughby* v. *Junction Railways, 5 Dick. Ch. Rep. 656,* heard by both Vice-Chancellor Green and Vice-Chancellor Van Fleet, and they concurred in the same result.

It must be remembered in this connection that these companies are not exercising any public franchise of carrying passengers or goods, but only the franchise of being a corporation. Their business is one that may be conducted by private individuals. They are simply the owners of a certain species of property which, in its natural state, is of no use to mankind, and which, after it has been manufactured and made fit for use, can hardly be classed as a necessity. The law forbidding forestalling the market does not, in my judgment, apply to the purchase of such property. *Jac. Dict.; Bouv. Dict., tit. "Forestalling."* By the law of the land these owners have the right to exercise their own judgment as to when, if ever, and how they will spend their money in preparing their property for market and rendering it fit for use by mankind. Now, I am unable to find any foundation, either in law or in morals, for the notion that the public have the right to have these private owners of this sort

of property continue to do business in competition with each other. No doubt the public has reasonable ground to entertain the hope and expectation that its individual members will generally, in their several struggles to acquire the means of comfortable existence, compete with each other. But such expectation is based entirely upon the exercise of the free will and choice of the individual, and not upon any legal or moral duty to compete, and can never, from the nature of things, become a matter of right on the part of the public against the individual. In fact, the essential quality of that series of acts or course of conduct which we call competition is that it shall be the result of the free choice of the individual and not of any legal or moral obligation or duty.

But I am satisfied that it is not the object of the consolidation to smother competition, and that the real object is to put an end, honorable and profitable to both parties, to a litigation whose issue is really incapable of satisfactory judicial determination.

For these reasons, which I am sorry that my daily attendance in court, since the argument, has prevented me from stating more at length, I shall advise that the application for an order of restraint be denied.