IDA R. MUSSON, in Her Own Behalf and on Behalf of All Stockholders of NEW YORK AND QUEENS ELECTRIC LIGHT AND POWER COMPANY Similarly Situated Who May Come in and Contribute to the Expense of This Action, Plaintiff, *v.* NEW YORK AND QUEENS ELECTRIC LIGHT AND POWER COMPANY and CONSOLIDATED GAS COMPANY OF NEW YORK, Defendants.

Supreme Court, New York County, January 15, 1931.

*Delehanty, Hannon, Evans & Loughran [James A. Delehanty and John T. Loughran of counsel], for Ida R. Musson, plaintiff.*

*Shearman & Sterling,* for the defendant Consolidated Gas Company of New York.

*Beardsley & Taylor [Chauncey B. Garver, Charles I. Taylor, Thomas H. Beardsley and P. F. W. Ruther of counsel],* for the defendant New York and Queens Electric Light and Power Company.

FRANKENTHALER, J. This is an action by a stockholder of the New York and Queens Electric Light and Power Company (hereinafter referred to as Queens) against that corporation and the Consolidated Gas Company of New York (hereinafter referred to as Consolidated). The complaint states that the plaintiff is suing in behalf of herself and all stockholders of Queens similarly situated who may come in and contribute to the expense of the action. It is alleged that prior to the year 1913 the plaintiff owned ten shares of the originally issued common stock of Queens, which consisted of 12,500 shares of preferred and 12,500 shares of common

stock, each having a par value of $100; that in 1913 Consolidated acquired 7,612 shares of preferred and 9,659 of common and, as majority stockholder, caused the Queens board of directors to be constituted of persons who were directors of Consolidated or of its subsidiaries; and that Consolidated then embarked upon a policy which had for its object the exploitation of Queens for the benefit of Consolidated, to the detriment of the other Queens stockholders. The complaint charges that in pursuance of this plan, Consolidated through its control of the board of directors of Queens, caused the dividend rate upon the five per cent non-cumulative preferred stock of Queens to be fixed at the rate of four dollars per annum from 1913 to 1921, despite the fact that the earnings available for such dividends averaged over twenty-six dollars per annum for each share, and that it thereby depressed the market value of the capital stock. It is further set forth that during the same period Consolidated depressed the market value of the Queens common stock by causing Queens to refrain from declaring a dividend upon that stock, although (after allowing for dividends at the full authorized rate upon the preferred stock) the earnings which were available for dividends on the common stock averaged twenty-one dollars per annum for each share. The claims are also made that in furtherance of its plan Consolidated caused Queens to fail to report to its other stockholders " all detailed information " as to the operations and earnings of Queens, thus concealing from them the actual value of the Queens stock, and that between 1913 and 1922 Consolidated acquired by purchase in the open market 878 additional shares of preferred stock of Queens and 1,007 of common at the depressed value which its policy had brought about. The complaint proceeds to allege that Consolidated caused a stockholders' meeting of Queens to be held on September 15, 1922, for the purpose of increasing the common stock of the latter company from 12,500 to 83,500 shares, and for the further purpose of authorizing the delivery of the newly created 71,000 shares to Consolidated in return for the cancellation of an indebtedness of $7,100,000 owing from Queens to Consolidated, of which $3,400,000 was represented by debenture bonds and the remaining $3,700,000 by open account; that the true and actual value of the 71,000 shares was in excess of $14,200,000, or more than $200 per share, which Consolidated well knew but caused to be concealed from the other stockholders of Queens; that Consolidated through the authorization secured at the stockholders' meeting acquired the 71,000 shares at less than half their actual value; and that Consolidated had secretly intended to have a dividend of seven per cent per annum declared upon the common stock immediately after the delivery of the 71,000 shares

to it, and actually carried out that intention as soon as the shares were received.

The plaintiff's grievance in respect of the foregoing allegations of the complaint is summarized in paragraph 14 of that pleading as follows: " By means of its policy and conduct as aforesaid, defendant Consolidated Gas Company of New York designed to and did create in the minds of the plaintiff and other stockholders of defendant New York & Queens Electric Light & Power Company the belief that their respective pre-emptive rights to subscribe to newly issued stock of defendant New York & Queens Electric Light & Power Company were worthless, although in fact such rights were of great value, thereby intending to prevent the exercise of such rights and thereby securing to itself the whole of such new issue of shares." There follow a number of other paragraphs in which it is averred that since 1925 the earnings of Queens available for dividends upon its common stock have averaged more than thirteen dollars per annum for each share, thus justifying an increase in the dividend rate to at least ten dollars per annum for each share, and, further, that Consolidated caused Queens to make voluntary reductions of rates charged to the latter's patrons with the object of neutralizing public dissatisfaction with the rates charged by Consolidated and its other subsidiaries from which the greater part of the income of Consolidated is derived. All these acts upon the part of Consolidated are characterized as " a breach and abuse of the fiduciary duty imposed upon it in the circumstances aforesaid to secure and protect the rights and interests of plaintiff and other minority stockholders of defendant New York & Queens Electric Light & Power Company."

Judgment is demanded (1) that the continuance of Consolidated's policy of exploitation be enjoined; (2) that Queens be directed to render to all its stockholders a detailed report of its operations and earnings since 1923; (3) that Queens be directed to declare a dividend of not less than ten dollars per share upon its common stock; (4) that the issue of 71,000 shares to Consolidated be canceled, the shares returned to the Queens treasury and an opportunity afforded to the plaintiff and other minority stockholders to subscribe ratably to them, and (5) that Consolidated be directed to account for all profits which have accrued to it upon the 71,000 shares.

It seems to be clear that neither the plaintiff nor any other stockholder of Queens had a pre-emptive right to subscribe to a proportionate part of the increase of 71,000 shares authorized at the meeting of September 15, 1922, the reason being that the pre-emptive right exists only where the new stock is issued for money, and not where it is to be used to purchase property for the cor-

poration. (*Stokes* v. *Continental Trust Co.*, 186 N. Y. 285, 286, 299, 300; *Dunlay* v. *Avenue M Garage & R. Co.*, 253 id. 274, 278; *Archer* v. *Hesse*, 164 App. Div. 493, 497; *Bond* v. *Atlantic Terra Cotta Co.*, 137 id. 671.)   (See, also, 43 Harvard Law Review, 586, at pp. 606 to 608.)   The 71,000 shares were not issued for money but for the purchase and extinguishment of the claims of Consolidated against the Queens company. These claims were property, assignable to others as well as to Queens, and no pre-emptive rights were, therefore, violated in failing to give the plaintiff or any other stockholder the opportunity of subscribing.   Moreover, even if it be assumed that the plaintiff did possess a pre-emptive right to subscribe, her conduct has been such as to make it inequitable to permit her at this late date to overthrow the issuance of the 71,000 shares to Consolidated.   Although the plaintiff received a notice of the meeting of stockholders to be held on September 15, 1922, which specifically informed her that the purpose of the meeting was to authorize the issue of the 71,000 shares and their delivery to Consolidated in discharge of the indebtedness to the latter, neither plaintiff nor any other stockholder made the slightest objection or protest, and the resolutions which effectuated the declared purpose of the meeting were unanimously adopted by the stockholders present, including the holders of a large number of shares not owned by Consolidated.   At the next annual meeting of Queens stockholders the plaintiff was present by proxy, and her proxy was included in the unanimous vote cast in approval of all the proceedings of the stockholders and directors for the preceding year (therefore, including the 1922 stock issue).   In 1924 the common stock of Queens was changed to 300,000 shares of no par value, and each stockholder received two of the new shares for each share of the old common stock and was given a right to subscribe to a proportionate part of the remaining 133,000 shares.   The plaintiff exercised this subscription right, but at no time asserted any claim with regard to the 1922 issue until she commenced the present action in the year 1929.   During this entire period, as well as prior to 1922, the periodical reports filed by Queens with the Public Service Commission were available to the plaintiff, as were data concerning the financial condition of Queens published in such year books as Moody's Analysis of Investments.   Whether the doctrine to be invoked is denominated as waiver, ratification or laches, or all of them, is immaterial.

In view of her conduct and subsequent inaction, the plaintiff should not be allowed to come in after the passage of seven years and upset all that has occurred in the meantime.   As the Court of Appeals said in *Stokes* v. *Continental Trust Co. (supra,* at p. 301):

" If he had remained silent and had made no request or protest he would have waived his rights." The plaintiff contends, however, that even if she possessed no pre-emptive right to subscribe to the 1922 issue of 71,000 shares, Consolidated, in view of its control of Queens through stock ownership and representation on the Queens board of directors, owed a duty to the minority stockholders of Queens to deal honestly and fairly with them. The correctness of this doctrine may be conceded. (*Dunlay* v. *Avenue M Garage & R. Co., supra.*) In the *Dunlay* case the Court of Appeals, after pointing out that a stockholder has no pre-emptive right to subscribe to unissued shares of an initially authorized issue where the issue of such unissued shares is reasonably necessary to raise money to be used in the business of the corporation and not for future expansion, declared that this doctrine was not in conflict with the elementary rule that " directors must always be free from fraud in their relations with their shareholders." The court said, POUND, J., writing the opinion (pp. 279, 280): " Fair dealing is required. * * * ' Corporate directors cannot manipulate the property, of which they have control in a trust relation, primarily with the intent to secure a majority of the stock or of directors in any particular interest. This is not a fair exercise in good faith of the power with which they are clothed.' (*Elliott* v. *Baker*, 194 Mass. 518.) Before acquiring stock for such a purpose the directors should offer it at a fixed price to all the stockholders, sell at auction or obtain a waiver of their rights." In the *Dunlay* case the claim was made that the directors of a corporation authorized the issue of unissued stock to themselves for the primary purpose of converting them from minority to majority stockholders. The court stated that this would involve a " breach of the duty of the directors as fiduciaries representing all the stockholders, irrespective of any doctrine of pre-emptive right." It did not, however, declare the transactions void merely because the directors acquired the stock, but, on the contrary, examined into the facts and decided that the trial court had correctly found that the shares had *not* been issued " for the sinister purpose of serving the personal ends of the directors in obtaining control of the corporation." Accordingly, it affirmed the judgment dismissing the complaint. Under the doctrine of the *Dunlay* case it would seem that the plaintiff here may succeed in her attack upon the stock issue of 1922 only if it is established that it constituted a breach of trust because it was dishonest or unfair to the minority stockholders of Queens. The mere circumstance that the stock was issued to the majority stockholders is not, of itself, sufficient to invalidate the transaction. The evidence indicates that at the time Consolidated acquired control of Queens,

in 1913, the latter's financial condition was weak and that it was not in shape to develop its territory properly and take advantage of its excellent possibilities. The best interest of all concerned, including the minority stockholders, rendered it expedient to accumulate a contingency reserve and to conserve the resources of the company. Substantial increases to plant and equipment were necessary in order to keep pace with the growth of the borough of Queens, and enlightened management dictated that the earnings of the company be used to increase capital assets and build up a large surplus. During the years 1914 to 1918, inclusive, the World War was in progress and outside financing was difficult and expensive, and this state of affairs continued for at least part of the post-war period preceding the year 1922. Although earnings increased to a marked extent from the time Consolidated acquired control in 1913, the considerations referred to would have made it unsound financial policy to make large distributions in the form of dividends to Queens stockholders, not to mention the fact that the growth in revenues was undoubtedly due in no small measure to the conservative methods adopted by the management.

The charge that the dividend policy prior to 1922 was pursued with the object of depressing the market value of the Queens stock so as to enable Consolidated to profit at the expense of minority stockholders is not borne out by the record. In view of the comparatively small number of Queens shares purchased by Consolidated between 1913 and 1922, it is difficult to give too much credence to the theory of artificial and deliberate depression of market values on its part. The claim of concealment of Queens earnings appears to stand on no better footing, for, as previously observed, the reports to the Public Service Commission and the statistical year books furnished the public with a full and adequate basis for ascertaining the true value of the Queens shares. If the shares of Queens stock were, in fact, issued to Consolidated at less than their true value, it is almost inconceivable, with these sources of information available not only to stockholders *but also to the financial community*, that not a single voice should have been raised in objection or disapproval. The evidence establishes, in the court's opinion, that at the time of the proposal to issue the 71,000 shares for property amounting to $7,100,000 that amount ($7,100,000) was the true and fair value of the shares, giving proper effect to the earnings per share on the basis of the modified capital structure, the comparative infancy of the company, the nature of the assets whose valuations were reflected in the book value of the stock, and the various other influences to be considered in appraising the shares. As a result of the enormous *subsequent* growth of the

borough of Queens, the continued prosperity which characterized the period since 1922, the efficient management of the Queens company, and other circumstances, the revenues of Queens have grown and its stock has become much more valuable. In 1922, however, the existence of all these factors and the part each would play could not be definitely known or foretold, and Consolidated should not be held guilty of a breach of trust merely because the course of subsequent events has proved that the Queens stock was a bargain in 1922 at the price of $100 per share (in property) paid by Consolidated at that time. The transaction was fair and honest when consummated and this is sufficient to dispose of the breach of trust theory, not to mention the elements of laches, waiver and ratification previously adverted to. As to the demand that the dividend rate on the Queens stock be increased, it need only be said that the evidence does not warrant interfering with the judgment of the board of directors which is conclusive in a matter of this character, except where the directors are acting in bad faith, or for a dishonest purpose. (*Liebman* v. *Auto Strop Co.*, 241 N. Y. 427, at p. 433.) The exceptions are clearly not applicable here.

There is left for consideration only the charge that Consolidated caused the Queens company to make voluntary reductions in rates to Queens consumers for the purpose of appeasing dissatisfaction with the rates charged by Consolidated and its other subsidiaries. The evidence shows that these reductions were actually brought about through pressure exerted by the Public Service Commission and were not really voluntary or gratuitous. Furthermore, there is no proof that the purpose of the reduction was to allay public clamor against rates charged by others, and it is difficult also to perceive how a reduction to patrons of Queens could have the effect of satisfying those dealing with other companies. Moreover, it is unlikely, to say the least, that the reduction would have been made by Consolidated, which then owned ninety-seven per cent of the Queens stock, unless it was regarded as necessary or as good business policy. No cause for complaint on this score has been established by the plaintiff.

For the reasons indicated the complaint is dismissed upon the merits. The motion to strike out the third defense in the answer of each defendant is granted, with appropriate exceptions. Exhibits B and D annexed to each answer are excluded, with exceptions to the defendants. Defendants' motions to strike out, upon which decision was reserved, are denied with exceptions to the defendants.