The complainants own 39,200 shares of the common stock of Cuba Company, a corporation of New Jersey, or 6% of the 640,000 shares outstanding. Debentures of the company will become payable January 1st, 1949, in the sum of *Page 341 
$6,937,077, principal and interest. The board of directors have formulated a plan for refunding the greater part of this debt and purpose to consummate the plan immediately. The complainants sue to prevent their doing so, alleging that the plan is beyond the powers of the directors and unlawful in certain aspects, and that it is so unwise and disadvantageous to the company as to indicate bad faith and improper motives on the part of the directors.
The debentures were originally issued in 1905 in the principal sum of $4,000,000, carrying interest at 6%. A default in 1932 was followed by a stand-still agreement under which interest was allowed to accumulate. Six years later came a reorganization under section 67 (b) of the Bankruptcy Act. Back interest of $330 on each debenture was funded, the interest rate was reduced to 3%, and suit for principal or interest was banned until January 1st, 1949. Practically no interest has been paid since 1932. The directors now offer to the debenture holders either (1) $1,800 in new 6% debentures and $15.37 in cash for each old debenture, or (2) $1,475 in new debentures and $20.87 in cash, plus 150 shares of common stock. If one-fifth, in amount, of the debenture holders decline both offers, and insist on the cash due them next January, and two-fifths elect to accept one alternative offer, and two-fifths the other alternative, the company, in settlement of the old debentures, will have to pay out $1,445,400 and issue 240,000 shares of common stock and $5,440,000 face value of new debentures. One year's interest on the debentures will be $326,400, and if one-twelfth of the principal is paid into the sinking fund each year, to the maturity in 1960, $453,333 will be required annually for that purpose.
The Cuba Company is a holding company, whose only substantial asset is the entire issue of common stock of Compania Cubana, a corporation of Cuba. Cubana owns and operates sugar mills and plantations, and also holds all the common stock of Consolidated Railroads of Cuba, a Cuban corporation. Consolidated, in turn, owns the common stock of two operating railroad companies, Cuba Railroad Company and Northern Railroad of Cuba. *Page 342 
Complainants say that one obvious way out of the difficult situation that confronts the Cuba Company is to borrow enough from the railroad companies to pay the debentures in full. The balance sheet of Consolidated and its subsidiaries, June 30th, 1947, showed total assets less depreciation of $98,000,000, of which $14,600,000 was cash. Net earnings for the fiscal year which will close the end of this month, are expected to range between $4,500,000 and $5,000,000, and to increase substantially the cash on hand. The liabilities of the railroad companies, June 30th, 1947, were:
Miscellaneous ....................................... $12,466,495
Long-term debt ...................................... 24,392,797
Non-cumulative preferred stock of Cuba Railroad Co. . 10,000,000
Cumulative preferred stock of Consolidated Railroads 30,307,562
Common stock and surplus ............................ 20,842,192
 ___________
 Total ......................................... $98,009,046

The long-term debt is affected by a Cuban law which reduces the interest rate to 1% and requires amortization of the debt by 1970. No dividends have been paid on either issue of preferred stock since 1932. Accrued dividends on the cumulative stock total $28,034,495, so that in effect the book value of the common stock is represented by the minus quantity, $7,192,303. The fiscal year 1946-47 was a good one for the railroads and yielded net earnigs of $4,899,963. If preferred dividends for the year had been paid, as well as one-twelfth of the funded debt, there would have remained around $1,375,000. Assume that earnings at this rate continue, still it will be many years before the preferred dividends in arrears can be paid off and earnings become applicable to the common stock. Obviously, the common stock has presently no value except as it gives the holder thereof power to dictate the railroad operations. These railways have a mileage of 1,084 miles, or about 30% of the total railroad mileage on the island. Possibly some other railroad company might be willing to buy the common stock of Consolidated in order to co-ordinate the operations of Consolidated's system *Page 343 
with its own line to the advantage of both companies and of the public. Except some such transaction be effected, I can see no benefit accruing or to accrue to the Cuba Company from its ownership of that stock.
The primary duty of the directors of the Consolidated Railroads is owed to the Cuban public and the creditors and preferred stockholders of the company and its subsidiaries. It would be entirely wrong for the directors to make a loan to the Cuba Company. Should they do so, they certainly would be personally liable for the money and might even incur criminal penalties.
Complainants next urge that Cuba Company could raise the necessary funds by using the credit of the sugar company, Compania Cubana, to supplement the cash which Cuba Company and Cubana may normally be expected to have on hand January 1st, 1949. A consolidated statement of the two companies as of June 30th, 1947, follows. In it, I have omitted the common stock of Consolidated Railroads and have given effect to a sale of certain lands and payment of a bank loan after June 30th.
Cash on hand ................................. $3,069,337
Other current assets ......................... 1,529,064
 __________ $4,598,401
Accounts payable, c. ........................ 310,619
Reserve for taxes, c. ....................... 1,224,955
 __________ 1,535,574
 ___________
Working capital ........................................... $3,062,827
Sugar mills and other property (less depreciation of
 $10,065,639) ............................................ 8,306,116
Miscellaneous assets ...................................... 658,593
 ___________
 Total ............................................. $12,027,536
Debentures with interest ..................... $6,697,678
Preferred stock (accumulated dividends
 $2,785,417) ................................ 2,500,000
Common stock and surplus ..................... 2,829,858
 __________
 Total ............................................... $12,027,536

The net income of the two companies for 1946-1947, before deducting interest, was $2,270,406. The interest item was *Page 344 
interest accrued on the debentures and paid on a bank loan the principal of which has since been paid in full. Mr. Monroe, president of the Cuba Company, estimates Cubana earnings for the current year at $1,300,000, of which about $450,000 will be represented by an increase in inventory. Let us suppose that cash on hand January 1st, 1949, will be somewhat over $4,000,000, and that after retaining a sufficient sum for working cash, $2,500,000 or $3,000,000 can be used toward payment of the debentures. It will still be necessary to raise an additional $4,000,000 or $4,500,000.
It was apparent to the directors that funds could not be raised by a public offering of securities. The company's history, its long-continued default in interest on its funded debt, inevitably led to that conclusion. The directors did make inquiry of the bank with which the companies usually did business and found that they could borrow on a note only if the loan were secured by pledge of sugar and molasses, and that practically they could furnish the security for no more than $2,000,000. The complainants present a persuasive affidavit that at least as much could also be obtained by mortgaging the sugar mills. The management does not seem to have explored this possibility, or whether the Consolidated Railroad stock could be sold advantageously, or whether, on payment of all arrears of debenture interest, $734 on each debenture, the old debentures might remain outstanding for the balance of the original term which will expire in 1955. While all the circumstances of the case may perhaps indicate that the directors have not been alert or shown business acumen, they do not indicate bad faith. Acts of directors, done in good faith and in the exercise of an honest judgment, will not be reviewed or set aside by the court on the ground that they are impolitic or inexpedient. Ellerman v.Chicago Junction, c., Co., 49 N.J. Eq. 217; Farmers Loan, c.,Co. v. Hewitt, 94 N.J. Eq. 65 and 187; General InvestmentCo. v. American Hide, c., Co., 97 N.J. Eq. 214; 98 N.J. Eq. 326.
It remains to be considered whether the plan of refinancing is within the scope of the powers of the board of directors, or whether it must be submitted to the stockholders for *Page 345 
approval. Our statute directs that the business of every corporation shall be managed by its board of directors. R.S.14:7-1. The directors have ample authority to apply the funds of the company to payment of its debts, to agree with creditors on an extension of the debt and a funding of interest in arrears, and to issue evidences of the indebtedness. Since the new debentures in this case will be credited at a discount of 6%, the directors in effect agree to pay a bonus that brings the interest rate to about 6 3/4%. I have no doubt that this, too, is within their powers. The attack of complainants is directed against the proposed issue of common stock and against covenants in the indenture that restrict the authority of the directors and stockholders as long as any of the debentures remain unpaid.
The certificate of incorporation authorizes the company to "issue and sell its authorized but unissued shares of common stock from time to time for such consideration, no less than par, as from time to time may be fixed by the board of directors." Complainants say that the plan does not contemplate a sale of the stock, but rather an exchange, and so is not within the terms of the charter. The provision of the certificate of incorporation is taken with immaterial changes from our statute relating to non-par capital stock. R.S. 14:8-7. Under the statute, stock may be issued for a consideration that is not money, but is property or services. R.S. 14:8-9. G. Loewus Co. v. HighlandQueen, c., Co., 125 N.J. Eq. 534. The charter provision should receive a similar interpretation. The power to issue and sell permits issuance for any consideration properly fixed by the board of directors.
The complainants further suggest that the stock is about to be issued at less than par, which is $1 a share. That the consideration is the old debentures which are worth much less than their face amount. But the company is not buying the old debentures; they are to be canceled. It is paying part of its debt by the issuance of stock. The consideration for the stock is the amount of debt thereby satisfied. If the new debentures are figured at 96, the new stock will be issued at $2 a share; if the debentures are figured at their face *Page 346 
amount, the consideration for the stock is $1.41 a share. In either case, it is above par.
The next question presented relates to the pre-emptive right of each stockholder to subscribe to his proportion of any new issue of stock. The authorized common capital stock of the Cuba Company is 1,000,000 shares, of which 640,000 shares are now outstanding. If the holders of 2,400 out of the 4,000 debentures should elect to accept the offer which includes 150 shares of stock for each debenture, the entire 360,000 shares now unissued would go to debenture holders without giving the present stockholders opportunity to subscribe for the new stock. The common stock of the company would be increased more than 50%. It was formerly the rule in this State that each stockholder's right to subscribe to new shares could not be taken away by the vote of his fellow stockholders. In Wall v. Utah Copper Co., 70 N.J. Eq. 17,
this rule was applied by Vice-Chancellor Pitney to prohibit the issuance of bonds convertible into stock at the option of the bondholder. An exception to the rule appears in another decision of the same judge, Meredith v. New Jersey Zinc and Iron Co.,55 N.J. Eq. 211; 56 N.J. Eq. 454. In that case, the corporation had made a contract approved by the stockholders to issue a large amount of capital stock in satisfaction of the purchase price of certain mines. "As the stock is issued for the purchase of property which will become a part of the common property, and from which the dissenting stockholder will receive the same benefit, if any, as each of his associates, I can see no reason for the application of the rule in this case." Since the date of these decisions, our corporation law has been amended to authorize convertible bonds, provided two-thirds in interest of the stockholders consent, R.S. 14:8-5, and allowing the pre-emptive right of stockholders to be annulled by express provision of the certificate of incorporation or of by-laws adopted by two-thirds in interest in each class of stockholders.R.S. 14:8-17. The statute refers only to "the issue of capital stock for cash" and may be regarded as a restatement of the rule that had been developed by the courts and a confining of the stockholders' pre-emptive right to the case of an issue for cash. *Page 347 
But this seems too narrow a construction. I think the legislature did not intend to take away the stockholders' right to subscribe, in situations where theretofore the right had existed.
Does the issuance of stock in payment of a pre-existing debt fall within the condemnation of Wall v. Utah Copper Co.? It has been said that "The reason for the exception relative to issuance for property, however, is practical necessity. Where the shares are to be issued for cash, the cash of one is as good as that of another. But the desired property is all held by a single person; he only can transfer it to the corporation. Usually it is not feasible to issue the shares for cash and then to use such cash to acquire the property, since the prospective shareholder will probably have stipulated that the property must be exchanged directly for shares. Unless the shares can be so issued direct, the property often cannot be acquired." 43 Harvard L. Rev. 586.
This reasoning does not tend to uphold the issuance of shares in payment of a debt, unless it be that the speculative element in the stock would move some creditors to accept it, who would decline the money equivalent of $2 a share.
Defendants cite Musson v. New York, c., Co.,247 N.Y. Supp. 406, holding that the issuance of stock in satisfaction of a debt does not impair a stockholder's pre-emptive right. But it may be noted that stockholders had voted approval of the action and that the New York rule is materially different from ours. In our sister state, stock can be issued for cash to raise money to meet corporate obligations without first giving present stockholders opportunity to take the stock. Dunlay v. Avenue MGarage (N.Y.), 170 N.E. Rep. 917.
I have not had time, since the argument of the motion for an interlocutory injunction ten days ago, to study the problem thoroughly enough to reach a definite opinion. Counsel for defendants asked for a decision on the motion within a week and presented excellent reasons for his request. So I would not be justified in taking further time for consideration. I lean toward the view that in this case, where the directors propose to increase the outstanding common stock by more than 50%, each stockholder has a right to subscribe, unless *Page 348 
the right be cut off by the action of two-thirds in interest of the stockholders.
Let us pass on to the remaining question. The debentures are to be issued under an indenture whereby the Cuba Company covenants that it will not take or permit certain action over the objection of stated proportions of debenture holders. The covenants remain operative as long as any of the debentures are outstanding, that is, 12 years, unless the company redeems them in advance of their due date. Among the prohibited acts are the sale of the stock of Compania Cubana or Consolidated Railroads, the creation of any mortgage upon the properties of either, or their recapitalization or reorganization. It seems to me that these covenants may seriously hamper the proper management of the company and its subsidiary. Our Corporation Act gives the stockholders ultimate control by prohibiting to directors a longer term of office than five years. R.S. 14:7-3. The directors propose, in important respects, to restrict such control for twelve years.
While the power of directors to agree on the terms of payment of the company's debt and to arrange for security cannot be doubted, yet when they plan so to exercise the power as to change substantially the capital structure of the company and to control in important respects the discretion of their successors and of the stockholders for a long period, they should seek the approval of the stockholders before committing the company.
Defendants urge that in a doubtful situation such as this, the court should refuse interlocutory relief. Citizens Coach Co. v.Camden Horse Railroad Co., 29 N.J. Eq. 299. But if the injunction is denied, the plan will immediately be put into effect, the new securities will be issued to a very large number of persons and will be the subject of sales to innocent holders. A decree for complainants after final hearing would be futile, unless an injunction now issues. Doubt of the validity of the complainants' asserted cause of action is therefore not an adequate reason for refusing an injunction. Guangione v.Guangione, 97 N.J. Eq. 303; Christiansen v. Local 680, c.,127 N.J. Eq. 215.
Interlocutory injunction granted. *Page 349