7 N.J. Super. 360 (1950)
71 A.2d 158
IN THE MATTER OF THE APPLICATION FOR A DISSOLUTION OF THE EVENING JOURNAL ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY.
POST-STANDARD COMPANY ET AL., PLAINTIFFS,
v.
THE EVENING JOURNAL ASSOCIATION ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 23, 1950.
*362 Messrs. O'Mara, Conway & Schumann, for the plaintiffs, by Mr. J. Edward O'Mara and Mr. Joseph A. Davis.
Mr. John D. McMaster, for defendant Evening Journal Association.
Messrs. Carpenter, Gilmour & Dwyer, for defendants Dear Publication & Radio, Inc., Messrs. J. Albert Dear and Cyrene B. Dear, by Mr. James D. Carpenter, Jr., and Mr. Samuel M. Coombs.
STANTON, J.S.C.
This action was brought by plaintiffs in the former Court of Chancery for the dissolution of Evening Journal Association, publisher of a newspaper known as the Jersey Journal, pursuant to what is sometimes called the Deadlocked Corporation Statute, R.S. 14:13-15. The association and the holders of one half of its stock have filed counterclaims in which it is alleged that while plaintiffs are holders of record of one-half of the issued stock nevertheless some part thereof is in fact and in equity held in trust for the association. At the time the plaintiff Post-Standard Company acquired title to half of the issued stock of the association from Walter M. Dear and members of his family, *363 it entered into an agreement with him regarding his continuance in the employ of the association for a period of two years, and it is contended by defendants that the salary, or part of it, paid to him by the association during such period, was not for services rendered to the association but, to use the language of the defendants, "a guise or device" for the expenditure of the association's funds to satisfy deferred installments of the purchase price. Defendants ask that a determination be made of the fair and reasonable money value of the services rendered by Walter M. Dear and that the excess of the salary paid above such value be adjudged to have been in payment of stock sold to the Post-Standard Company, and that a trust be impressed in favor of the association on so many of its shares as were thus paid for with its funds and that such shares be held as treasury stock.
At the pretrial conference it was agreed that proofs would be taken first on the counterclaims for the obvious reason that a determination thereof favorable to defendants would be dispositive of the main action. Such proofs have been taken and briefs have been submitted.
Off and on during a period of ten years, Samuel I. Newhouse, one of the plaintiffs and the publisher of a chain of newspapers, discussed with Walter M. Dear the purchase of the Jersey Journal in its entirety or of the half interest of the latter and his family, but without reaching an agreement until November 15, 1945. During the five years prior to this date, Mr. Dear negotiated also with his nephew J. Albert Dear for the sale to the latter of a half interest in the association, but these negotiations terminated without agreement in October, 1945. In their respective dealings with Walter Dear the initiative was always taken by Newhouse and Albert Dear.
On November 15, 1945, at a meeting in New York City attended also by Charles Goldman, Newhouse's attorney, Walter Dear agreed to sell a one-half interest in the association to Newhouse for $450,000 with the closing to be held in about a week  the date to depend on the return from Florida of former Judge Robert Carey, Mr. Dear's attorney. The testimony of these three participants in the meeting is to the effect *364 that there was a definite agreement of sale for 1,050 shares of stock in Evening Journal Association for $450,000 cash, that the details and mechanics of concluding the transaction would await the return of Judge Carey. It also appears that at this conference Walter Dear declared that he wanted to sell his interest and retire from the paper and that no effort was made at that time by Newhouse to induce him to remain in the employ of the association. The 1,050 shares which were the subject of the sale were on this date registered on the association's books as follows: Walter M. Dear 675 shares, Maud F. Dear 160 shares, Katharine A. Dear 119 shares, Ida A. Dear 81 shares, Eleanor D. Phillips 15 shares. On November 21, 1945, certificates for these shares were delivered to the Post-Standard Company and shortly thereafter the association in exchange therefor issued certificates of stock as follows: Post-Standard Company 1,048 shares, Samuel I. Newhouse, 1 share, Norman N. Newhouse 1 share. There was no change in the registration of these 1,050 shares at the time of the institution of this action.
In November and December, 1945, the other 1,050 shares of the company were registered on the association's books as follows: J. Albert Dear 1,049 shares, Joseph A. Dear 1 share; on the institution of this action, as follows: Dear Publication and Radio, Inc., 1,048 shares, J. Albert Dear 1 share; Cyrene B. Dear 1 share.
On November 19, 1945, Walter Dear and Judge Carey met with Mr. Goldman at his office in New York City and discussed closing mechanics, and the protection of the purchaser against undisclosed debts, pending law suits and the like. No mention was made of any agreement concerning the continuance of Walter Dear in the employ of the association. It was then arranged to close the transaction at Judge Carey's office in Jersey City on the afternoon of November 21st.
On this latter date, Ernest L. Owen, then Vice-President and Treasurer of the Post-Standard Company, Mr. Goldman, Walter Dear and Judge Carey sat down to close the transaction. Time was consumed in pleasantries and in drafting two agreements between Post-Standard Company and Walter Dear *365 which are marked exhibits R 2 and R 3; in the former he agreed not to engage in the newspaper publishing business during the next ten years and in the latter he covenanted at length with respect to the financial condition of the association, its stock, property, obligations and so forth. Mr. Newhouse came to Judge Carey's office long after the start of the meeting and at a time when considerable detail had been disposed of. It was then, for the first time, that the matter of Walter Dear's remaining with the Jersey Journal was discussed. The fact was that for many years the stock of the association had been evenly divided between the families of Walter Dear and his brother, former Judge Joseph A. Dear. For a long time these two men divided the management of the paper between them. In more recent years, the former brought his daughter Katharine A. Dear into the management and the latter brought in his son J. Albert Dear. These four were the directors of the association on November 21, 1945. Mr. Newhouse stated that his organization had no one to act for it in the management of the Jersey Journal and asked Walter Dear if he would not remain in the same capacity at the same salary for a term of ten years. Mr. Newhouse referred to Mr. Dear's long connection with the paper, his high standing in the newspaper industry and the stabilizing influence his remaining would have on employee relations and the like. After Mr. Dear referred to his desire to retire, he expressed a willingness to remain for a short time until things adjusted themselves. Finally he agreed to remain for two years, and, as he put it, to round out fifty years with the paper, but only if Mr. Newhouse obtained his nephew Albert's consent. This for the reason that their relations of late had not been happy and the latter would most likely be disappointed that he had not acquired the stock interest of his uncle. At this point Katharine A. Dear was sent for, informed of her father's decision and asked if she would also remain with the paper. She was surprised but she agreed. It was then that the agreement, known as exhibit R 1, was drawn. Shortly after this, Mr. Newhouse left and the agreements were signed by Mr. Owen on behalf of the Post-Standard *366 Company. When the papers were executed, the parties went to the office of the Trust Officer of the Trust Company of New Jersey where the stock was delivered and the purchase price of $450,000 was paid in full.
Inasmuch as great importance was attached to the agreement, exhibit R 1, it is set forth below from the beginning to the testimonium clause, except for the elimination of paragraphs 1 (b), 2 and 3 which relate to the qualification and service of Walter Dear and his daughter as directors. Since they did not thereafter act as directors, and successors were elected a month later, these parts may be omitted here.
"THIS AGREEMENT, made this 21st day of November, 1945, between THE POST STANDARD COMPANY, a corporation of the State of New York, having its principal office in the City of Syracuse, State of New York, party of the first part, WALTER M. DEAR, now residing at 34 Bentley Avenue, in the City of Jersey City, County of Hudson and State of New Jersey, party of the second part, and KATHARINE A. DEAR, now residing at 34 Bentley Avenue, in the City of Jersey City, County of Hudson and State of New Jersey, party of the third part,
"WITNESSETH:
"WHEREAS, simultaneously with the execution of this agreement, the party of the first part did acquire from the parties of the second and third parts and from other parties, certain shares of the capital stock of The Evening Journal Association, a corporation organized under the laws of the State of New Jersey, hereinafter called the Corporation,
"NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, it is agreed by and between the parties hereto as follows:
"1. The party of the first part agrees to and with the party of the second part as follows:
"(a) that the party of the second part shall continue to occupy his official position, relationship and employment as treasurer and general business manager of the Corporation for a period of two (2) years from the date hereof, at the same salary as at present being drawn and received by the party of the second part from the corporation and the party of the first part shall act in the exercise of its stock right or stock control so as to enable the party of the second part to perform all the proper functions and duties as such treasurer and general manager.
"4. The party of the second part hereby agrees that by virtue and consideration of his continued employment as hereinabove provided, he will consult with the designated representatives of the party of the first part in all matters pertaining to the policy of the corporation, *367 the fixing of salaries of officers of the corporation, and the employment of executives of the corporation, and any and all kindred matters.
"5. This agreement shall be binding upon and shall enure to the benefit of the parties hereto and the successors and assigns of the party of the first part, and the personal representatives of each of the parties of the second and third parts."
On Thanksgiving Day, November 22, 1945, Walter Dear informed his nephew Albert Dear of the sale and arranged for a luncheon conference on the following day at the Hotel Plaza in New York, which was attended by them, Mr. Newhouse, Mrs. Albert Dear and Mr. John McMaster. There is a dispute as to whether Mr. McMaster was present as attorney for Albert Dear or for the association. The luncheon was a stormy one. Mr. and Mrs. Albert Dear were openly hostile to Walter Dear. Mrs. Dear testified that she had plenty to say and in response to a question, as to what she had said and to whom, she answered: "Uncle Walter. I told him he was a traitor to the family for selling out, not telling us about it, especially when we had expected that he would sell to us and I think I called him a modern Esau." The disappointment and resentment of Albert Dear and his wife is understandable when it is remembered that his grandfather was one of the founders of the paper and that they had sons who were following in his footsteps. At any rate, Mr. Newhouse got the meeting back to its original purpose which was to plan for the future. The question of Walter Dear's remaining with the association came up and Albert Dear expressed vigorous opposition. Newhouse testified that he stated Walter Dear had signed a two-year contract subject to his nephew's approval. Albert Dear said that having sold out, he should get out. Mr. Newhouse urged his retention on two grounds, his own inability to serve because of other business obligations and Walter Dear's value to the paper especially in the transition period following the sale of the half interest. Albert Dear urged Newhouse to take Walter Dear's place and if he was unwilling then to name someone else. It is clear that Walter Dear's retention was obnoxious to his nephew who was willing to agree to any one but his uncle. There then followed a discussion as to what would happen if, because of *368 Albert Dear's opposition, Walter Dear should refuse to stay. The by-laws of the association were referred to and it will be noted that they contained many provisions which had their genesis in the equal division of the stock ownership. It was pointed out by Newhouse that if Walter Dear and his daughter resigned, the association would lack a board of directors, a treasurer and a secretary, and that a situation might readily develop which would require one party or the other to seek a dissolution of the association. Newhouse also suggested that a meeting be held shortly with all the employees of the paper, at which they would be advised that Walter Dear had sold his interest in the paper but that he would continue as theretofore in the management and that there would be no change in the policy of the paper. This meeting would also serve to introduce Newhouse to the employees. This plan was agreed to and a cocktail party was held on the following Sunday, November 25th, at which Walter Dear made the announcement outlined above. It may be noted here that Albert Dear denied that he was informed at the luncheon that a contract had been signed by Walter Dear to continue with the paper for two years. He testified also that when he left the luncheon he was not convinced that Walter Dear should be retained. But the fact is that it was then agreed to hold the cocktail party at which Walter Dear would take the part mentioned above, and the latter did in fact make such announcement. It seems clear that there was some understanding that he would be retained. I am persuaded that the matter of Walter Dear remaining for a two-year period as set forth in Exhibit R 1 was mentioned at the luncheon. Albert Dear's consent to Walter Dear's remaining was not required, except that the latter insisted upon it. Under the by-laws he would have held over as a director and as treasurer until Newhouse and Albert Dear concurred in his replacement. I am of the belief that the matter was opened to Albert Dear by Newhouse because of the agreement Exhibit R 1 and that mention was made of the two year term.
As the result of an understanding between Albert Dear and Newhouse at the cocktail party, Mr. McMaster and Mr. Goldman *369 met in New York on November 27, 1945, for the purpose of setting up machinery for the adjustment of any disputes that might arise between them in the management of the association. This was held, but nothing of importance was accomplished except the calling of a further conference on December 6, 1945, at which Albert Dear, Newhouse, Goldman and McMaster were present. Certain understandings were reached regarding a modus operandi and these were to be reduced to writing by the attorneys. McMaster over the course of six or seven days made three separate drafts and submitted them to Goldman; they are in evidence as exhibits P 5, P 7 and R 4. Exhibit R 4, which is dated December 12, 1945, was signed by the parties thereto on December 13th and it is referred to in the testimony as the Peace Treaty. The parties to this agreement are Albert Dear and Judge Dear of one part, and Samuel I. Newhouse, in behalf of himself and the Post-Standard Company of the other. The parts of this agreement which affect the immediate issue are as follows:
"WHEREAS, the parties hereto are respectively in control, each of them, of a one-half (1/2) interest in all of the stock of The Evening Journal Association, a New Jersey corporation, which publishes The Jersey Journal in Jersey City (hereinafter called `the corporation'); and
"WHEREAS, SAMUEL I. NEWHOUSE owns or controls substantially all of the stock of The Post-Standard Company, which has acquired a one-half (1/2) interest in all of the stock of the corporation; and the said Samuel I. Newhouse owns or controls newspapers in Syracuse, Jamaica, Long Island City and Staten Island, in the State of New York, and in Newark, in the State of New Jersey, (hereinafter called the `Newhouse Enterprises'); and
"WHEREAS, the parties hereto desire to make provision for the harmonious operation of The Jersey Journal with the aim of making that newspaper prosper and grow and with the intention of protecting the investments of the respective parties hereto in the corporation;
"NOW, THEREFORE, IT IS AGREED by and between the parties, in consideration of the premises, the mutual undertakings herein provided, One Dollar, and other good and valuable consideration, as follows:
"1. That, as stockholders the parties will vote all their stock for the election of the following directors: Joseph A. Dear, J. Albert Dear, Jr., Samuel I. Newhouse and Norman N. Newhouse; and will at all times during the term of this agreement vote all their stock for the election as directors of two persons designated by the party of *370 the first part and two persons designated by the party of the second part; and that this equal division of directors as between the parties will be maintained in the case of vacancies, death, disability, etc.
"2. That, as directors of the corporation, the parties will vote, or cause their designees to vote, for the election of the following officers:
 "Joseph A. Dear, Chairman of the Board
 "J. Albert Dear, Jr., President
 "Walter M. Dear, Treasurer
 "Katharine A. Dear, Secretary and Asst. treasurer
and will at all times during the term of this agreement vote, or cause their designees to vote, as directors, for the election of such person or persons as Chairman of the Board or President (or Vice President in lieu of Chairman of the Board), as may be designated by the party of the first part; and for the election of such person or persons as Treasurer or Secretary and ass't treasurer as may be designated by the party of the second part.
"3. That the By-laws of the corporation shall be amended in the following respects:
"(a) by creating the office of Chairman of the Board of Directors.
"(b) By deleting from Article XI the words: `The treasurer shall be the general manager of the association.'
"4. That, as directors of the corporation, the parties will vote, or cause their designees to vote, for a resolution continuing Walter M. Dear (so long as he holds the office of Treasurer) in his same general duties as heretofore, except insofar as same are modified by this agreement.
"5. That the annual salaries of the officers shall be as follows:

 "Chairman of the Board $11,700.
 "President $26,000.
 "Treasurer 26,000.
 "Secretary 7,500.

"1. That this agreement shall be operative forthwith and the several provisions thereof requiring corporate action and sanction shall be effected by appropriate procedure as soon as practicable.
"12. That this agreement (which does not undertake to cover all matters incident to operating the corporation) shall run to December 31, 1947, unless sooner terminated or amended by mutual agreement of J. Albert Dear, Jr., and Samuel I. Newhouse, and their respective heirs, legal representatives and assigns."
Pursuant to the Peace Treaty, a meeting of the stockholders was held on December 24, 1945, at which the by-laws were amended and Newhouse and his brother Norman N. Newhouse were elected in place of Walter and Katharine Dear. Likewise on the same day a directors' meeting was held at which, among other things, the following were elected to the positions indicated and at the salaries mentioned:

*371
 Joseph A. Dear, Chairman of the Board, $225 per week.
 J. Albert Dear, President $500 per week.
 Walter M. Dear, Treasurer $500 per week.
 Katharine A. Dear, Secretary & Assist.
 Treasurer $150 per week.

On July 2, 1946, Judge Dear's resignation as director was accepted and Cyrene B. Dear, wife of Albert Dear, was elected in his place. The vacancy in the office of Chairman of the Board was not filled, but Mrs. Dear was elected Vice-President and her salary was fixed at $6,500 per year. The directors voted to employ Judge Dear as associate editor at a salary not to exceed $5,200 per year.
Walter Dear was thereafter re-elected as Treasurer in 1946 and 1947, but like all the officers failed of re-election on January 27, 1948, because of dissension among the directors. He held over as treasurer until his resignation on July 13, 1948. His salary was paid regularly until the end of January, 1948, after which time Albert Dear refused to sign checks for his salary. Katharine A. Dear resigned as secretary and assistant treasurer in July, 1948, but has since continued in the employ of the association in another capacity.
Upon the resignation of Walter Dear and his daughter, they were succeeded by Samuel I. Newhouse as Treasurer and Norman N. Newhouse as Secretary and Assistant Treasurer at the salaries received by their predecessors.
What is Exhibit R 1? It is simply an agreement whereby Post-Standard Company, owner of a one-half interest in the Evening Journal Association, sought a voice in its management. A corporation itself, it could act only through individuals suggested by it. One phase of the agreement concerned the retention of Walter Dear and his daughter as directors, but as they did not serve as such thereafter, it was not discussed in the briefs and need not be now; another was the continuance of Walter Dear as Treasurer for a term of two years at the same salary of $26,000 per annum. The latter obligated himself to consult with Post-Standard Company in matters of policy, the employment of executives, the fixing of officers' salaries and kindred matters. It will be noted that *372 his undertaking was to consult, not to serve the other party. And the latter agreed to support him by the use of its stock right which it had just acquired. The other parties having disposed of all their shares were no longer directors. In the argument it has been referred to as an employment contract, but it is not strictly that because the association is not a party to it; nor is it equivalent to it because the stockholder had less than a controlling interest.
Defendants claim that Exhibit R 1 is an integral part of the stock sale, a product of a fraudulent scheme to use the association's funds in part payment of the purchase price and a breach of trust. In this connection, it is appropriate to examine the common intention of the parties, their situation and the surrounding circumstances. Cameron v. International Alliance, 119 N.J. Eq. 577, 581. The recital in the agreement is only one item to be considered with the other facts and circumstances. There is undisputed testimony that on November 15, 1945, Walter Dear and Newhouse made a definite agreement for the sale of 1,050 shares for $450,000 in cash and that delivery and payment were made in full on November 21st; that on the latter date the matter of Walter Dear's continuance as Treasurer was first discussed and the agreement Exhibit R 1 was then drawn and executed. This and the sale are of course related, but they are not integral. In Exhibit R 1 Post-Standard Company agreed to vote its stock to continue Walter Dear in his office and he in turn agreed to consult with it. The consideration for the salary to be paid him by the association was the rendition to it of the same service in the same capacity that he had rendered during the previous thirty-seven years. There is no proof of any agreement or understanding that less service would be required or expected from him. There is nothing to indicate that Walter Dear gave or undertook to give anything but his services for the payment of his salary at the long established rate. It is quite clear that the sale of the stock and the agreement of November 21st are completely distinct and separate transactions. It is equally clear that there is nothing fraudulent in the agreement.
*373 When it entered into it, Post-Standard Company was a stockholder but as such it was not a fiduciary of the association or of any other stockholder. A stockholder has a property interest in the corporation and the right to take appropriate means to protect that right. Stephany v. Marsden, 75 N.J. Eq. 90, 93; General Investment Co. v. American Hide & Leather Co., 97 N.J. Eq. 214, 219. This is not the case of a director contracting with his corporation, therefore cases, such as United States Steel Corp. v. Hodge, 64 N.J. Eq. 807, dealing with the breach of a director's duty as a fiduciary are not applicable here. Post-Standard Company breached no duty to the association or its stockholders when it entered into Exhibit R 1.
In West v. Camden, 135 U.S. 507, defendant, a director in a corporation, agreed to place plaintiff as an officer of the corporation and to continue him there permanently. That contract was held to be unenforceable as being against public policy. Such an agreement might hinder a director in discharging his full duty to his corporation. But it is not sought here to enforce any such contract. And at the time of the execution of exhibit R 1 no agent or designee of the Post-Standard was a director of the association.
In the Peace Treaty, Exhibit R 4, Albert Dear and his father, as stated above, agreed among other things, to elect Walter Dear as Treasurer and fix his salary at $26,000 per annum. Defendants contend the fraudulent concealment of Exhibit R 1 by plaintiffs vitiated the Peace Treaty. It is not disputed that Exhibit R 1 was not seen by defendants until May, 1949. There is testimony on behalf of plaintiffs that its contents were disclosed to Albert Dear at the luncheon on November 23, 1945, and to him and Mr. McMaster at the Peace Conference on December 6, 1945; also to Mr. McMaster by Mr. Goldman prior to the Peace Conference. This testimony has been denied, but there are surrounding facts and circumstances that tend to corroborate plaintiffs' version. A preliminary draft of the Peace Treaty by Mr. McMaster provided that it would run for five years, that Walter Dear as Treasurer would serve for two years, but there was no limitation *374 on the terms of Albert Dear and Judge Dear; that the Peace Treaty as executed, Exhibit R 4, was to be effective until December 31, 1947  in effect, a two-year period; that at the directors' meeting held in January, 1948, Walter Dear was denied re-election by Albert Dear; that although Walter Dear held over as Treasurer under the by-laws and served as such until July, 1948, he was not compensated therefor after January, 1948, because of the refusal of Albert Dear to sign his salary checks; that until this dissolution action was instituted in March, 1948, Albert Dear made no objection to the quantum of the salary of his uncle and raised no question about the inadequacy or quality of the service performed by him  his only objection to Walter Dear from the luncheon on November 23rd to and through the Peace Conference was that he was personally obnoxious; at all times Albert Dear stated he would vote for Newhouse or his nominee at the salary fixed for Walter Dear; and he did in fact vote to elect Newhouse at the same salary in July, 1948. These and other circumstances indicate knowledge by Albert Dear of Post-Standard's undertaking to Walter Dear in Exhibit R 1.
There should be noted here Albert Dear's contention that Mr. McMaster did not represent him at the Peace Conference and in the drafting of the Peace Treaty. He does admit, however, that he acted for him in January, 1948, and thereafter in certain "buy or sell" negotiations with Newhouse. The fact is that in the Fall of 1945 and for many years before, Judge Carey was the attorney for the association although, at about that time, Mr. McMaster had been retained in some matters by the association. And it is true that for his services in these peace negotiations, Mr. McMaster was paid by the association. But the fact is that at the Peace Conference there were only two parties involved, Albert Dear and Samuel Newhouse, and each of these had an equal and common interest in the welfare of the association. Since Mr. McMaster was not representing Newhouse, the conclusion is inescapable that he was in fact acting for Albert Dear.
It might be pertinent to ask why there should be any question about the concealment of Exhibit R 1. What was there *375 in it to conceal? At the luncheon meeting  the first meeting after the sale  Newhouse concededly discussed with Albert Dear the retention of Walter Dear as Treasurer. What then did he conceal? Not the salary nor the duties, because they had been unchanged in many years and it was not proposed to change them. Was it the two-year term? That was a short time with reference to a man who had been in the employ of the paper for forty-eight years. Was it the undertaking by Post-Standard Company that it would use its stock right to continue him in office? Was that not made apparent to Albert Dear by the attitude of Newhouse? After Newhouse stated his position at the luncheon, there was nothing to conceal and I am convinced that nothing in Exhibit R 1 as it relates to the retention of Walter Dear, as Treasurer, was in fact concealed. There was at that time nothing objectionable to Albert Dear in Exhibit R 1 but his uncle.
There is nothing in Exhibit R 1 and there is nothing in anything that transpired between the date of its execution and the stoppage of Walter Dear's salary in January, 1948, to indicate that the salary paid to him during that period was for anything except his services to the association. It is pertinent to observe here that at the time the agreement was signed, he was almost seventy years old and there was no provision for the payment of salary after his death and no provision that anyone close to him should succeed to his office and salary. Such provisions are to be found where salaries are paid for considerations other than personal service rendered.
Where the stock of a corporation is divided into two equal parts, human nature being what it is, it is necessary and advisable for the parties to anticipate the possibility of a deadlock. The Dear brothers, Walter and Judge Joseph A., were equal owners of the stock of the association over a period of years and they adopted a set of by-laws which were peculiarly adapted to their situation and were designed to facilitate the conduct of the association's business in the event of disagreement between them. When the Newhouse interests took over the holdings of Walter Dear and his family, it became advisable, if not indeed essential, that they and the *376 Albert Dear interests should agree on a modus operandi for the association. They recognized this need and the Peace Treaty was the product of their efforts to promote harmony in the management. The signatories are the holders of the entire issued stock. They agreed upon action to be taken at subsequent meetings of the stockholders and directors; that among the commitments was the election of Walter Dear as Treasurer at $26,000 per annum during the two-year period of the agreement. This Peace Treaty was executed with knowledge of the undertaking of Post-Standard Company in Exhibit R 1 with respect to Walter Dear and constitutes a ratification thereof in so far as it relates to his continuance as Treasurer for a two-year period. The stockholders and directors carried out the terms of the Peace Treaty on December 24, 1945, and since they had knowledge of the terms of Exhibit R 1, the association also is deemed to have had knowledge of it.
In the counterclaims filed in April, 1948, it is charged that Walter Dear did not earn the salary that was paid him for the years 1946 and 1947. This despite the fact that it was paid regularly and periodically by checks signed by Albert Dear who owned or controlled a half interest in the association during the period in question and who was in a position to observe daily whether or not he rendered the required services. It is clear from the evidence that for the first six months of the period he discharged all the duties and responsibilities that he had for many years before. It was then that Albert Dear interfered in real estate and labor matters and prevented Walter Dear from carrying on as theretofore. If the latter's labors were lightened by Albert Dear's interference neither he nor his interests may now complain of it.
Furthermore there is evidence that, in this association, services performed were not the sole determinant of officers' salaries. For instance, in 1940 Albert Dear's salary was increased from $160 a week to $500, and at the same time his father's weekly salary was reduced from $500 to $225. At that time there was no change in Albert Dear's duties and no change in his status except that he was then elected a *377 director. Again in July, 1946, Judge Dear's salary was reduced from $11,700 to $5,200 per annum. At the same time Albert Dear's wife was elected Vice-President at $6,500 per annum  the exact amount of Judge Dear's reduction. What service she has performed for this salary does not appear but it is to be noted that, although Newhouse voted in favor of this action, he nevertheless demanded, and at the time received, from Albert Dear an agreement indemnifying the association against any income tax claim by the United States Government because of the deduction of her salary as a business expense  indicating her salary was not considered to be for services performed.
It was shown that Walter Dear's salary from 1908 to 1948 was $26,000 per annum, except in 1933 and 1934 when he, in common with all employees, suffered a reduction.
There is no satisfactory proof that he did not earn his salary from December, 1945, to January, 1948. In my opinion he earned what he was paid.
Even if he had not earned it in full, defendants cannot now complain because all stock interests joined in paying him. No rights of third parties such as creditors are here involved, there has been no impairment of the corporate capital and no public right has been affected. The defendants are estopped from contending that Walter Dear was paid a salary in excess of the worth of his services. Whitfield v. Kern, 122 N.J. Eq. 332; Perkins v. Trinity Realty Co., 69 N.J. Eq. 723; Breslin v. Fries-Breslin Co., 70 N.J.L. 274; Murtland Holding Co. v. Egg Harbor, etc., Bank, 123 N.J. Eq. 117.
This is not a corporate opportunity case such as Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503. There a director deprived his corporation of the opportunity to make a profitable investment and used its funds to seize it for himself. A trust was impressed on the property acquired and the director was required to account. What opportunity was Evening Journal Association deprived of? The sole question here is payment of salary by the association to Walter Dear. It was entitled to his services and got them  the same service it had previously received for many, many years at the same salary.
*378 The counterclaimants are Albert Dear, his wife, his holding company and the Evening Journal Association. The counterclaim of the latter is the action of Albert Dear  it was not filed by the direction of the Board of Directors. Both counterclaims alleged the unlawful payment of funds to Walter Dear but neither seeks its return to the treasury. All counterclaimants, even the association, demand the impression of a trust on certain of the shares held by Post-Standard Company  and to what end? To pass control of the association to Albert Dear without his paying for it. If he were to get such control, the owner of the other half interest would become a minority stockholder. It is obvious from his conduct from the moment the Newhouse interests came into the association that the expenditure of the salary of $26,000 per annum to a treasurer, be he Walter Dear or Samuel Newhouse or a designee of the latter, did not concern him from a monetary standpoint  in his mind that sum of money was there to be paid to a treasurer. And he is not concerned now with the recovery of it or any part of it  he is concerned only with asserting its alleged improper expenditure for the purpose of gaining control of the association for himself.
In effect defendants contend that Newhouse, a man apparently of very substantial means, paid down $450,000 in cash for the purchase and delivery of a block of stock which gave him a half interest in Evening Journal Association, and at the same time attempted to pay some undisclosed, but concededly, proportionately small part of the alleged purchase price, by engaging to vote his 50% stock interest to retain a corporate officer for a term of two years at a salary in excess of the value of his services. I have found as a fact that such was not the sales agreement and that there was no such overpayment of salary. But assuming, for the sake of argument, that some part of Walter Dear's salary had not been earned, it would be only a very small fraction of the cash payment of $450,000. It is a matter of common knowledge that the control of corporations has been acquired with small cash payments and thereafter attempts have been made to use corporate funds to pay the deferred part of the purchase price, but *379 in the light of the ordinary experience of mankind and of common knowledge of human mental processes, it is to be wondered whether a man of the means, standing, ability and experience of Newhouse would enter into any such transaction as defendants have alleged in their counterclaims. Defendants having failed to establish the truth of their counterclaims, the same should be dismissed.